**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARIA M. GONZALEZ,; LUCIANO
VALENCIA; THE INTER TRIBAL
COUNCIL OF ARIZONA, INC.;
ARIZONA ADVOCACY NETWORK;
STEVE M. GALLARDO; LEAGUE OF
UNITED LATIN AMERICAN CITIZENS
ARIZONA; LEAGUE OF WOMEN
VOTERS OF ARIZONA;
PEOPLE FOR THE AMERICAN WAY
FOUNDATION; HOPI TRIBE,
*Plaintiffs,*

and

BERNIE ABEYTIA; ARIZONA HISPANIC
COMMUNITY FORUM; CHICANOS POR
LA CAUSA; FRIENDLY HOUSE; JESUS
GONZALEZ; DEBBIE LOPEZ;
SOUTHWEST VOTER REGISTRATION
EDUCATION PROJECT; VALLE DEL
SOL; PROJECT VOTE,
*Plaintiffs- Appellants,*

17617

v.

STATE OF ARIZONA; JAN BREWER, in
her official capacity as Secretary
of State of Arizona; SHELLY
BAKER, La Paz County Recorder;
BERTA MANUZ, Greenlee County
Recorder; CANDACE OWENS,
Coconino County Recorder; LYNN
CONSTABLE, Yavapai County
Election Director; KELLY DASTRUP,
Navajo County Election Director;
LAURA DEAN-LYTLE, Pinal County
Recorder; JUDY DICKERSON,
Graham County Election Director;
DONNA HALE, La Paz County
Election Director; SUSAN
HIGHTOWER MARLAR, Yuma County
Recorder; GILBERTO HOYOS, Pinal
County Election Director;
LAURETTE JUSTMAN, Navajo County
Recorder; PATTY HANSEN,
Coconino County Election
Director; CHRISTINE RHODES,
Cochise County Recorder; LINDA
HAUGHT ORTEGA, Gila County
Recorder; DIXIE MUNDY, Gila
County Election Director; BRAD
NELSON, Pima County Election
Director; KAREN OSBORNE,
Maricopa County Election
Director;

YVONNE PEARSON, Greenlee County
Election Director; PENNY PEW,
Apache County Election Director;
HELEN PURCELL, Maricopa County
Recorder; F. ANN RODRIGUEZ, Pima
County Recorder,
                    *Defendants-Appellees,*

YES ON PROPOSITION 200,
        *Defendant-intervenor-Appellee,*

No. 08-17094
D.C. Nos.
2:06-cv-01268-ROS
06-cv-01362-PCT-
JAT
06-cv-01575-PHX-
EHC

MARIA M. GONZALEZ; BERNIE
ABEYTIA; ARIZONA HISPANIC
COMMUNITY FORUM; CHICANOS POR
LA CAUSA; FRIENDLY HOUSE; JESUS
GONZALEZ; DEBBIE LOPEZ;
SOUTHWEST VOTER REGISTRATION
EDUCATION PROJECT; LUCIANO
VALENCIA; VALLE DEL SOL;
PEOPLE FOR THE AMERICAN WAY
FOUNDATION; PROJECT VOTE,
                            *Plaintiffs,*

                and

THE INTER TRIBAL COUNCIL OF
ARIZONA, INC.; ARIZONA ADVOCACY
NETWORK; STEVE M. GALLARDO;
LEAGUE OF UNITED LATIN AMERICAN
CITIZENS ARIZONA; LEAGUE OF
WOMEN VOTERS OF ARIZONA; HOPI
TRIBE,
                    *Plaintiffs-Appellants,*

                         v.

STATE OF ARIZONA; JAN BREWER, in
her official capacity as Secretary
of State of Arizona; SHELLY
BAKER, La Paz County Recorder;
BERTA MANUZ, Greenlee County
Recorder; CANDACE OWENS,
Coconino County Recorder; PATTY
HANSEN, Coconino County
Election Director; KELLY DASTRUP,
Navajo County Election Director;
LYNN CONSTABLE, Yavapai County
Election Director; LAURA DEAN-
LYTLE, Pinal County Recorder;
JUDY DICKERSON, Graham County
Election Director; DONNA HALE,
La Paz County Election Director;
SUSAN HIGHTOWER MARLAR, Yuma
County Recorder; GILBERTO
HOYOS, Pinal County Election
Director;

LAURETTE JUSTMAN, Navajo County
Recorder; CHRISTINE RHODES,
Cochise County Recorder; LINDA
HAUGHT ORTEGA, Gila County
Recorder; DIXIE MUNDY, Gila
County Election Director; BRAD
NELSON, Pima County Election
Director; KAREN OSBORNE,
Maricopa County Election
Director; YVONNE PEARSON,
Greenlee County Election
Director; PENNY PEW, Apache
County Election Director; HELEN
PURCELL, Maricopa County
Recorder; F. ANN RODRIGUEZ, Pima
County Recorder,
                    *Defendants-Appellees,*

YES ON PROPOSITION 200,
    *Defendant-intervenor-Appellee.*

No. 08-17115

D.C. No.
2:06-cv-01268-ROS

OPINION

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, District Judge, Presiding

Argued and Submitted
October 20, 2009—Tucson, Arizona

Filed October 26, 2010

Before: Sandra Day O'Connor, Associate Justice,*
Alex Kozinski, Chief Judge, and Sandra S. Ikuta, Circuit
Judge.

Opinion by Judge Ikuta;
Dissent by Chief Judge Kozinski

---

*The Honorable Sandra Day O'Connor, Associate Justice of the United
States Supreme Court (Ret.), sitting by designation pursuant to 28 U.S.C.
§ 294(a).

**COUNSEL**

Nina Perales, Mexican American Legal Defense and Education Fund, San Antonio, Texas, for Plaintiffs/Appellants Jesus M. Gonzalez, et al.

Jon M. Greenbaum, Lawyers Committee for Civil Rights Under Law, Washington, D.C., for Plaintiffs/Appellants Inter Tribal Council, et al.

Karen J. Hartman-Tellez, Phoenix, Arizona, for Plaintiffs/Appellants Inter-Tribal Council, et al.

Barbara A. Bailey, Assistant Attorney General, Phoenix, Arizona, for Defendants/Appellees State of Arizona and Arizona Secretary of State Ken Bennett.

Mary R. O'Grady, Solicitor General, Phoenix, Arizona, for Defendants/Appellees State of Arizona and Arizona Secretary of State Ken Bennett.

Dennis Wilenchik, Wilenchik and Bartness, P.C., Phoenix, Arizona, for Defendants/Appellees Shelly Baker, La Paz County Recorder, et al.

Sam Hirsch, Jenner & Block LLP, Washington, D.C., on behalf of Amicus Curiae The League of Women Voters of the United States.

Kali N. Bracey, Jenner & Block LLP, Washington, D.C., on behalf of Amicus Curiae The League of Women Voters of the United States.

Jessica Ring Amunson, Jenner & Block LLP, Washington, D.C., on behalf of Amicus Curiae The League of Women Voters of the United States.

Barnaby W. Zall, Weinberg & Jacobs, LLP, Rockville, Maryland, on behalf of Amicus Curiae American Unity Legal Defense Fund, Inc.

Charles E. Borden, O'Melveny & Myers LLP, Washington, D.C., on behalf of Amicus Curiae National Association of Latino Elected and Appointed Officials Educational Fund.

Joel M. Spector, Mountain States Legal Foundation, Lakewood, Colorado, on behalf of Amicus Curiae Mountain States Legal Foundation.

Michael J. Reitz, Evergreen Freedom Foundation, Olympia, Washington, on behalf of Amicus Curiae Evergreen Freedom Foundation.

Brian D. Netter, Mayer Brown LLP, Washington, D.C., on behalf of Amici Curiae Congressman Robert A. Brady, Con-

gresswoman Zoe Lofgren, Congressman Charles A. Gonzalez, Congressman Raul M. Grijalva, and Congressman Jose E. Serrano.

Richard A. Samp, Washington Legal Foundation, Washington, D.C., on behalf of Amici Curiae Protect Arizona Now, Washington Legal Foundation, and Allied Educational Foundation.

---

## OPINION

IKUTA, Circuit Judge:

Proposition 200 requires prospective voters in Arizona to present documentary proof of citizenship in order to register to vote, Ariz. Rev. Stat. §§ 16-152, 16-166, and requires registered voters to present proof of identification in order to cast a ballot at the polls, Ariz. Rev. Stat. § 16-159. This appeal raises the questions whether Proposition 200 violates the Voting Rights Act § 2, 42 U.S.C. § 1973, is unconstitutional under the Fourteenth or Twenty-fourth Amendments of the Constitution, or is void as inconsistent with the National Voter Registration Act (NVRA), 42 U.S.C. § 1973gg *et seq*. We hold that the NVRA supersedes Proposition 200's voter registration procedures, and that Arizona's documentary proof of citizenship requirement for registration is therefore invalid. We reject the remainder of Appellants' arguments.

I

On November 2, 2004, Arizona voters passed a state initiative, Proposition 200, which (upon proclamation of the Governor) enacted various revisions to the state's election laws. Among other changes, Proposition 200 amended the procedures for voter registration and for checking voters' identification at polling places in both state and federal elections.

With respect to voter registration procedures, Proposition 200 amended two state statutes. First, it added the following requirement to section 16-152 of the Arizona Revised statutes, which lists the contents of the state voter registration form:

> The form used for the registration of electors shall contain . . . [a] statement that the applicant shall submit evidence of United States citizenship with the application and that the registrar shall reject the application if no evidence of citizenship is attached.

Ariz. Rev. Stat. § 16-152(A)(23). Second, it amended section 16-166 of the Arizona Revised statutes to state that: "The County Recorder shall reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship," and defined satisfactory evidence of citizenship to include a driver's license or similar identification license issued by a motor vehicle agency, a birth certificate, passport, naturalization documents or other specified immigration documents, or specified cards relating to Native American tribal status. *See* Ariz. Rev. Stat. § 16-166(F).[1]

---

[1]Section 16-166(F) provides the following list of approved identification documents:

1. The number of the applicant's driver license or nonoperating identification license issued after October 1, 1996 by the department of transportation or the equivalent governmental agency of another state within the United States if the agency indicates on the applicant's driver license or nonoperating identification license that the person has provided satisfactory proof of United States citizenship.

2. A legible photocopy of the applicant's birth certificate that verifies citizenship to the satisfaction of the county recorder.

3. A legible photocopy of pertinent pages of the applicant's United States passport identifying the applicant and the applicant's passport number or presentation to the county recorder of the applicant's United States passport.

Proposition 200 also addressed identification procedures at polling places. Specifically, Proposition 200 amended section 16-579 of the Arizona Revised Statutes to provide that voters "shall present one form of identification that bears the name, address and photograph of the elector or two different forms of identification that bear the name and address of the elector." Ariz. Rev. Stat. § 16-579(A) (2004). The Secretary of State, acting under statutory authority, *see* Ariz. Rev. Stat. § 16-452(A), (B), promulgated a procedure specifying the "forms of identification" accepted under the statute, which included photograph-bearing documents such as driver's licenses and non-photograph-bearing documents such as utility bills or bank statements. In 2009, the state legislature amended section 16-579 to codify that procedure.[2]

---

4. A presentation to the county recorder of the applicant's United States naturalization documents or the number of the certificate of naturalization. If only the number of the certificate of naturalization is provided, the applicant shall not be included in the registration rolls until the number of the certificate of naturalization is verified with the United States immigration and naturalization service by the county recorder.

5. Other documents or methods of proof that are established pursuant to the immigration reform and control act of 1986.

6. The applicant's Bureau of Indian Affairs card number, tribal treaty card number or tribal enrollment number.

[2]As of 2009, section 16-579(A)(1) provides:

(a) A valid form of identification that bears the photograph, name and address of the elector that reasonably appears to be the same as the name and address of the precinct register, including an Arizona driver license, an Arizona nonoperating identification license, a tribal enrollment card or other form of tribal identification or a United States federal, state or local government issued identification. Identification is deemed valid unless it can be determined on its face that it has expired.

(b) Two different items that contain the name and address of the elector that reasonably appears to be the same as the name and address in the precinct register, including a utility bill, a bank or

Shortly after Proposition 200's passage, various plaintiffs filed a complaint against Arizona to prevent the implementation of these changes. Two groups of plaintiffs are relevant to this appeal. Jesus Gonzalez, representing individual Arizona residents and organizational plaintiffs, claimed that Proposition 200 violated the NVRA (to the extent the Arizona enactment regulated federal registration procedures), was a poll tax under the Twenty-fourth Amendment, burdened naturalized citizens in violation of the Equal Protection Clause of the Fourteenth Amendment, and disparately impacted Latino voters and diluted Latino voting power in violation of § 2 of the Voting Rights Act. The Inter Tribal Council of Arizona (ITCA), a non-profit organization representing twenty Arizona tribes, filed a complaint along with various other organizations,[3] the Hopi Tribe, and Representative Steve Gallardo from the Arizona State House of Representatives.[4] Like Gon-

---

credit union statement that is dated within ninety days of the date of the election, a valid Arizona vehicle registration, an Arizona vehicle insurance card, Indian census card, tribal enrollment card or other form of tribal identification, a property tax statement, a recorder's certificate, a voter registration card, a valid United States federal, state or local government issued identification or any mailing that is "official election material." Identification is deemed valid unless it can be determined on its face that it has expired.

(c) A valid form of identification that bears the photograph, name and address of the elector except that if the address on the identification does not reasonably appear to be the same as the address in the precinct register or the identification is a valid United States Military identification card or a valid United States passport and does not bear an address, the identification must be accompanied by one of the items listed in subdivision (b) of this paragraph.

[3]ITCA's action was joined by the League of Women Voters of Arizona, the League of United Latin American Citizens, the Arizona Advocacy Network, and People For the American Way Foundation, as well as the claimants listed above.

[4]We refer to named plaintiffs Gonzalez and ITCA as representing all plaintiffs associated in their respective actions. Where appropriate, we

zalez, ITCA claimed that Proposition 200 violated the NVRA (to the extent it regulated federal registration procedures), and constituted a poll tax under the Twenty-fourth Amendment. ITCA also separately claimed that Proposition 200 was a poll tax under the Fourteenth Amendment. The district court consolidated Gonzalez and ITCA's complaints.

Gonzalez and ITCA moved for a preliminary injunction to enjoin application of Proposition 200's requirements in the 2006 general election, *Gonzalez v. Arizona* (*Gonzalez I*), 485 F.3d 1041, 1047 (9th Cir. 2007). The district court denied their motion, but a motions panel of this court reversed and granted the injunction pending disposition of the merits on appeal. *Id.* The Supreme Court vacated the injunction, and remanded for clarification whether this court had given due deference to the district court's findings of fact. *Id.* at 1048; *see Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006). On remand, Gonzalez and ITCA chose to pursue injunctive relief with respect only to Proposition 200's registration requirement. *Gonzalez I*, 485 F.3d at 1048. The *Gonzalez I* panel thereafter affirmed the district court's denial of the preliminary injunction, holding that Proposition 200's registration requirement was not a poll tax, *id.* at 1049, and was not a violation of the NVRA, *id.* at 1050-51. The district court subsequently granted Arizona's motion for summary judgment, relying on *Gonzalez I* to rule that Proposition 200 was not an unconstitutional poll tax and was not invalid as conflicting with the NVRA. After trial, the district court resolved all other claims in favor of Arizona, holding that Proposition 200 did not violate § 2 of the Voting Rights Act and did not discriminate against naturalized citizens or burden the fundamental right to

refer to Gonzalez and ITCA individually; however, because Gonzalez and ITCA bring the same NVRA and Twenty-fourth Amendment claims, we refer to both collectively as "Gonzalez" in the sections discussing these two claims. We refer to the defendants collectively as "Arizona," even though Arizona county recorders were also named as defendants in these consolidated actions.

vote in violation of the Fourteenth Amendment's Equal Protection Clause.

On appeal, Gonzalez and ITCA challenge the district court's rulings on the NVRA and the Twenty-fourth Amendment. In addition, ITCA claims that Proposition 200 is an invalid poll tax under the Fourteenth Amendment, and Gonzalez challenges the district court's decisions on both the Voting Rights Act claim and the equal protection challenge for discrimination based on national origin and undue burden on the fundamental right to vote. We consider each of these claims in turn.

II

We begin with Gonzalez's claim that Proposition 200's documentary proof of citizenship requirement for registration is superseded by the NVRA's comprehensive procedure for registering voters in federal elections. Gonzalez argues that the NVRA preempts Arizona law under both the Supremacy Clause and the Elections Clause of the U.S. Constitution. In response, Arizona relies on the Supremacy Clause's "presumption against preemption," *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996), to argue that the NVRA did not expressly or impliedly preempt state voter registration laws. Before addressing the parties' arguments, we first consider whether the framework of the Elections Clause or the Supremacy Clause guides our analysis here.

A

**[1]** The Elections Clause establishes a unique relationship between the state and federal governments. It provides:

> The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but Congress may at any time by Law make or alter such

> Regulations, except as to the Place of chusing Sena-
> tors.

U.S. Const. art, I, § 4, cl. 1. In a nutshell, the Elections Clause gives state governments initial responsibility to regulate the mechanics of national elections, "but only so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997).

The history of the Elections Clause reveals the reasoning behind this unusual delegation of power. Under the Articles of Confederation, the states had full authority to maintain, appoint, or recall congressional delegates.[5] At the Philadelphia Convention, delegates expressed concern that, if left unfettered, states could use this power to frustrate the creation of the national government, most obviously by neglecting to hold federal elections.[6] The Framers decided that Congress should be given the authority to oversee the states' procedures related to national elections as a safeguard against potential state abuse. *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 808-09 (1995)*; see also* The Federalist No. 59 (Alexander Hamilton) (Ron P. Fairfield 1981 ed., 2d ed.) (explaining that "[n]othing can be more evident, than that an exclusive power of regulating elections for the national government, in the hands of the State legislatures, would leave the existence of the Union entirely at their mercy"). Over the protest of

---

[5]*See* Articles of Confederation of 1781, art. V ("[D]elegates shall be annually appointed in such manner as the legislature of each state shall direct . . . with a power, reserved to each state, to recall its delegates . . . . Each state shall maintain its own delegates in a meeting of the states . . . .").

[6] *See* 1 The Debates in the Several State Conventions on the Adoption of the Federal Constitution as Recommended by the General Convention at Philadelphia in 1787 Together with the Journal of the Federal Convention, Luther Martin's Letter, Yates's Minutes, Congressional Opinions, Virginia & Kentucky Resolutions of '98-'99, and Other Illustrations of the Constitution 225 (photo. reprint 1987) (Jonathan Elliot ed., 2d ed. 1901) [hereinafter Elliot's Debates].

some Southern delegates,[7] the Framers approved language giving Congress power to "make or alter" the states' regula-*tions. See* 5 Elliot's Debates 401-02 (statement of James Madison). As subsequently modified to give Congress supervisory power, this language became the Elections Clause.[8]

As indicated by this historical context, the Elections Clause empowers both the federal and state governments to enact laws governing the mechanics of federal elections. By its plain language, the Clause delegates default authority to the states to prescribe the "Times, Places, and Manner" of conducting national elections in the first instance. U.S. Const. art. I, § 4, cl. 1. The states would not possess this authority but for the Clause: As the Supreme Court has noted, the authority to regulate national elections "aris[es] from the Constitution itself," and is therefore "not a reserved power of the States." *U.S. Term Limits*, 514 U.S. at 805. Because federal elections did not come into being until the federal government was formed, individual states have no inherent or preexisting authority over this domain. *See d.* at 804-05.

While the states have default responsibility over the mechanics of federal elections, because Congress "may at any time by Law make or alter such Regulations" passed by the state, U.S. Const. art. I, § 4, cl. 1, power over federal election

---

[7]South Carolinian delegates Charles Pinckney and John Rutledge moved to exclude the language giving Congress this supervisory power over the states. 5 Elliot's Debates at 401. "The states, they contended, could and must be relied on" to regulate legislative appointments. *Id. See also Vieth v. Jubelirer*, 541 U.S. 267, 275-76 (2004).

[8]Alexander Hamilton described the need for congressional oversight of the states as follows: "[The Framers] have submitted the regulation of elections for the federal government, in the first instance, to the local administrations; which, in ordinary cases, and when no improper views prevail, may be both more convenient and more satisfactory; but they have reserved to the national authority a right to interpose, whenever extraordinary circumstances might render that interposition necessary to its safety." The Federalist No. 59.

procedures has been described by the Supreme Court as ultimately "committed to the exclusive control of Congress." *Colgrove v. Green*, 328 U.S. 549, 554 (1946).[9] Accordingly, "the power of Congress over the subject is paramount. It may be exercised as and when Congress sees fit to exercise it. When exercised, the action of Congress, so far as it extends and conflicts with the regulations of the State, necessarily supersedes them." *Ex Parte Siebold*, 100 U.S. 371, 384 (1879); *see also Foster*, 522 U.S. at 69.

Not only does the Elections Clause grant Congress authority to supersede state election laws, but we have interpreted the Clause to require states to affirmatively implement Congress's superseding regulations, without compensation from the federal government. *Voting Rights Coalition v. Wilson*, 60 F.3d 1411, 1415 (9th Cir. 1995). Put another way, the Elections Clause gives Congress the power to "conscript state agencies to carry out [federal] voter" procedures in accordance with Congress's own mandates. *Id.* This makes the Clause unique among virtually all other provisions in the Constitution, which "mostly tell [states] not what they must do but what they can or cannot do." *ACORN v. Edgar*, 56 F.3d 791, 794 (7th Cir. 1995).

**[2]** In sum, a state's role in the creation and implementation of federal election procedures under the Elections Clause

---

[9]The Court has generally construed Congress's exclusive authority under the Elections Clause expansively. *See, e.g., United States v. Gradwell*, 243 U.S. 476, 483 (1917) (authority over federal election process, from registration to certification of results); *United States v. Mosley*, 238 U.S. 383, 386 (1915) (authority to enforce the right of an eligible voter to cast ballot and have ballot counted); *Ex Parte Coy*, 127 U.S. 731, 752-53 (1888) (authority to regulate conduct at any election coinciding with federal contest); *Ex parte Yarbrough* (*The Ku Klux Cases*), 110 U.S. 651, 662 (1884) (authority to make additional laws for free, pure, and safe exercise of right to vote); *Ex parte Clarke*, 100 U.S. 399, 404 (1879) (authority to punish state election officers for violation of state duties vis-a-vis Congressional elections).

is to administer the elections through its own procedures until Congress deems otherwise; if and when Congress acts, the states are obligated to conform to and carry out whatever procedures Congress requires. *See Foster*, 522 U.S. at 69.

As should be clear from this overview, the Elections Clause operates quite differently from the Supremacy Clause. The Supremacy Clause provides that the law of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "The primary function of the Supremacy Clause is to define the relationship between state and federal law. It is essentially a power conferring provision, one that allocates authority between the national and state governments." *White Mountain Apache Tribe v. Williams*, 810 F.2d 844, 848 (9th Cir. 1985).

**[3]** In our system of dual sovereignty, when deciding under the Supremacy Clause whether a particular state law is preempted by a federal enactment, courts strive to maintain the "delicate balance" between the States and the Federal Government. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991); *see Medtronic*, 518 U.S. at 485. Courts thus endeavor to preserve the states' authority when possible, *see Gregory*, 501 U.S. at 460, particularly where a congressional enactment threatens to preempt a state law regulating matters of its residents' health and safety, an area to which "[s]tates traditionally have had great latitude . . . to legislate" as a matter of local concern, *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985). *See also Altria Group, Inc. v. Good*, 129 S. Ct. 538, 543 (2008); *Medtronic*, 518 U.S. at 485. Only where no reconciliation between state and federal enactments may be reached do courts hold that Congress's enactments must prevail, *e.g.*, *Altria*, 129 S. Ct. at 543, with the understanding, however, that "the individual States . . . retain [their] independent and uncontrollable authority . . . to any extent" that Congress has not interfered, *see* The Federalist No. 33 (Alexander Hamilton).

In light of the different history and purpose of these constitutional provisions, it is not surprising that the preemption analysis for the Supremacy Clause differs from that of the Elections Clause. In its Supremacy Clause jurisprudence, the Supreme Court has crafted special guidelines to assist courts in striking the correct balance between federal and state power. First, in examining claims that a federal law preempts a state statute through the Supremacy Clause, the Supreme Court instructs courts to begin with a "presumption against preemption." *E.g.*, *Altria Group*, 129 S. Ct. at 543; *Medtronic*, 518 U.S. at 485. This principle applies because, as the Court has recently noted, "respect for the States as independent sovereigns in our federal system leads us to assume that Congress does not cavalierly pre-empt state-law causes of action." *Wyeth v. Levine*, 129 S. Ct. 1187, 1195 n.3 (2009) (internal quotation marks omitted). Second, the Court has adopted a "plain statement rule," holding that a federal statute preempts a state statute only when it is the "clear and manifest purpose of Congress" to do so. *Gregory*, 501 U.S. at 461 (internal quotation marks omitted); *see also Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) ("Consideration of issues arising under the Supremacy Clause starts with the assumption that the historic police powers of the States are not to be superseded by . . . Federal Act, unless that is the clear and manifest purpose of Congress.") (internal quotation marks and brackets omitted)). Like the presumption against preemption, this rule "is nothing more than an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." *Gregory*, 501 U.S. at 461.

**[4]** This jurisprudence, which is motivated in large part by federalism concerns, is unsuited to analyzing the preemptive effect of a congressional enactment under the Elections Clause. Because the states' sole power over national election procedures is that delegated by the Elections Clause, *U.S. Term Limits*, 514 U.S. at 805, and states otherwise have no reserved authority over this domain*, id.*, courts deciding

issues raised under the Elections Clause need not strike any balance between competing sovereigns. Instead, the Elections Clause, as a standalone preemption provision, establishes its own balance, resolving all conflicts in favor of the federal government. *See, e.g.*, *Foster*, 522 U.S. at 71 (stating that "the Constitution explicitly gives Congress the final say" on matters related to federal election procedures). For this reason, the "presumption against preemption" and "plain statement rule" that guide courts' analysis of preemption under the Supremacy Clause are not transferable to the Elections Clause context. *Cf. Gregory*, 501 U.S. at 460-61. Indeed, the Supreme Court has suggested as much. In *Foster*, the Court upheld the Fifth Circuit's determination that a state election law was voided by a federal election law; however, instead of adopting the Fifth Circuit's Supremacy Clause analysis, the Supreme Court analyzed the claim under the Elections Clause, without ever mentioning any presumption against preemption or requirement of a plain statement of congressional intent to preempt. *See Foster*, 522 U.S. 67; *Love v. Foster*, 90 F.3d 1026 (5th Cir. 1996), *cert. granted* in 522 U.S. 67. In fact, our survey of Supreme Court opinions deciding issues under the Elections Clause reveals no case where the Court relied on or even discussed Supremacy Clause principles.

**[5]** Because the Elections Clause empowered Congress to enact the NVRA, *Wilson*, 60 F.3d at 1414, the preemption analysis under that Clause is applicable here. We begin our analysis as the Court did in *Foster*, guided by Election Clause preemption principles. *Accord Harkless v. Brunner*, 545 F.3d 445, 454 (6th Cir. 2008) (declining to apply Supremacy Clause preemption principles in analyzing the preemptive effect of the NVRA).

B

The Supreme Court first explained the principles of Elections Clause preemption in *Siebold*, 100 U.S. 371. In that case, the Court likened the relationship between the laws

passed by Congress and the state legislatures under the Elections Clause to "prior and subsequent enactments of the same legislature." *Id.* at 384. "The State laws which Congress sees no occasion to alter, but which it allows to stand, are in effect adopted by Congress." *Id.* at 388. By this token, just as a subsequent legislature is not required to make an "entirely new set" of laws when modifying those of a prior legislature, neither is Congress required to wholly take over the regulation of federal election procedures when choosing to "make or alter" certain of the states' rules. *Id.* at 384. According to the Court, there is no "intrinsic difficulty in such co-operation" between the state and national legislatures because the two governments do not possess an "equality of jurisdiction" with respect to federal elections. *Id.* at 392. While Congress may override state enactments, the state may not vitiate an action of Congress by adopting a system of regulations to undo congressional efforts. *See id.* at 393, 397. In all instances, "the laws of the State, in so far as they are inconsistent with the laws of Congress on the same subject, cease to have effect as laws." *Id.* at 397.

Over a century later, the Supreme Court clarified what constitutes a conflict under the Elections Clause's single system of federal election procedures. *See Foster*, 522 U.S. 67. *Foster* considered whether a congressional enactment superseded a Louisiana statute regulating the same federal election procedure. *Id.* at 68-69. Specifically, sections 1 and 7 of Title 7 of the U.S. Code established the date for federal congressional elections as the Tuesday after the first Monday in November. *Id.* at 69-70. A Louisiana statute established an open primary in October where state voters could elect the candidate who would fill the offices of United States Senator and Representative. *Id.* at 70. Only if the open primary failed to result in a majority candidate would a run off election between the top two candidates be held on Congress's specified election day. *Id.* In response to a challenge by Louisiana voters, the Court unanimously held that the state and federal acts conflicted, and thus invalidated the Louisiana law. *Id.* at 74.

In concluding that Congress's power to preclude the state statute was beyond argument, the Court rejected the state's claim that its statute and the federal enactment could be construed harmoniously. *Id.* at 73. Louisiana asserted that "the open primary system concern[ed] only the 'manner' of electing federal officials, not the 'time' at which the elections will take place." *Id.* at 72. The Court discarded this "attempt to draw this time-manner line" as "merely wordplay" and an "imaginative characterization" of the statutes. *Id.* at 72-73. Building upon the principles from *Siebold*, the Court declined to adopt a strained interpretation of the statutes to reconcile a potential disagreement. *See id.* Rather, the Court emphasized Congress's unique plenary authority not only to supplant state rules but to conscript states to carry out federal enactments under the Elections Clause, and found it enough that, under a natural reading, the state and federal enactments addressed the same procedures and were in conflict. *Id.* (noting that the Louisiana's regulation addressed the timing of elections "quite as obviously" as the federal one). Refusing to "par[e] [the statute] down to the definitional bone," the Court held that the state enactment was void. *Id.* at 72, 74.

**[6]** Reading *Siebold* and *Foster* together, we derive the following approach for considering whether federal enactments under the Elections Clause displace a state's procedures for conducting federal elections. First, as suggested in *Siebold*, we consider the state and federal laws as if they comprise a single system of federal election procedures. *Siebold*, 100 U.S. at 384. If the state law complements the congressional procedural scheme, we treat it as if it were adopted by Congress as part of that scheme. *See id.* If Congress addressed the same subject as the state law, we consider whether the federal act has superseded the state act, based on a natural reading of the two laws and viewing the federal act as if it were a subsequent enactment by the same legislature. *Foster*, 522 U.S. at 74. With this approach in mind, we consider whether the NVRA and Proposition 200 operate harmoniously in a single procedural scheme for federal voter registration.

## C

To resolve the question here, we must first understand both the federal and state voter registration procedures at issue. We earlier explained the changes to Arizona's registration statutes under Proposition 200, which incorporated a requirement that registrants submit documentary proof of citizenship in order to register to vote. *See supra* Part I; Ariz. Rev. Stat. §§ 16-152, 16-166. Our next step is to examine the scope of the NVRA.

### 1

Congress enacted the NVRA because, among other reasons, it determined that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 42 U.S.C. § 1973gg(a).

Initially, Congress attempted to address this problem by enacting legislation that permitted the government and prospective voters to challenge discriminatory practices in the courts. *See South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966) (discussing the Civil Rights Act of 1957, which "authorized the Attorney General to seek injunctions against public and private interference with the right to vote on racial grounds," and the Civil Rights Act of 1964, which "expedited the hearing of voting cases before three-judge courts and outlawed some of the tactics" used to disqualify African Americans from voting in federal elections).[10] The elimination of discriminatory voting practices through litigation, however, was "slow and expensive, and [meanwhile] the States were creative in contriving new rules to continue violating the Fif-

---

[10]Neither of these Acts were passed under the substantive authority of the Elections Clause, and therefore the Elections Clause analysis is not applicable to cases considering these enactments.

teenth [and Fourteenth] Amendment[s] in the face of adverse federal court decrees." *Nw. Austin. Mun. Utility Dis. No. One v. Holder* (*NAMUDNO*), 129 S. Ct. 2504, 2508-09 (2009) (internal quotations marks omitted). To limit voter registration, some local officials defied court edicts or "simply closed their registration offices to freeze the voting rolls." *Katzenbach*, 383 U.S. at 314. Congress's attempts to "authoriz[e] registration by federal officers . . . had little impact on local maladministration." *Id.* Nearly a century after the Civil War, registration of eligible African American voters in some states was still fifty percentage points lower than that of eligible white voters. *Shaw v. Reno*, 509 U.S. 630, 640 (1993).

Congress tried a different approach to addressing this problem by passing the Voting Rights Act of 1965 (VRA), Pub. L. No. 89-110, 79 Stat. 437 (codified at 42 U.S.C. § 1973 *et seq.*). The VRA, enacted under the authority of Congress's Fifteenth Amendment enforcement powers, is "a complex scheme of stringent remedies aimed at areas where voting discrimination has been most flagrant." *Katzenbach*, 383 U.S. at 308, 315. As enacted, the VRA suspended the use of literacy tests, § 4(a)-(d), required covered jurisdictions to pre-clear changes in voting procedures and practices, § 5, and provided for the appointment of federal examiners to assist in registering qualified citizens to vote, §§ 6, 7, 9, 13. Section 2 of the VRA also permits actions to be brought to void voting qualifications or prerequisites "resulting in the denial or abridgement of the right of any citizen of the United States to vote on account or race or color."

**[7]** While considered on the whole to be a successful tool in eliminating the more obvious discriminatory voting procedures, *see NAMUDNO*, 129 S.Ct. at 2511, the VRA failed to address voter registration procedures, which imposed a "complicated maze of local laws and procedures, in some cases as restrictive as the out-lawed practices, through which eligible citizens had to navigate in order to exercise their right to vote," H.R. Rep. No. 103-9, at 3 (1993). Between 1988 and

1993, Congress held a series of hearings focused on reforming the voter registration process to address the increasingly pressing issue of low voter turnout in federal elections. *Condon v. Reno*, 913 F. Supp. 946, 949 n.2 (D.S.C. 1995). Congress found that, while over eighty percent of registered citizens voted in Presidential elections, only sixty percent of eligible voters were registered. H.R. Rep. No. 103-9, at 3. Public opinion polls showed that the primary reason eligible citizens were not voting was the failure to register. *Id.* While acknowledging that this failure was attributable to many factors outside its control, Congress enacted the NVRA to address the problems within its control, namely those barriers to registration that were imposed by state governments. *See id.* Under the Elections Clause, Congress had the power "to provide a complete code for congressional elections, not only as to times and places, but in relation to . . . registration." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). Through this authority, Congress enacted the NVRA to remove these obstacles and "to provide simplified systems for registering to vote in federal elections." *Young v. Fordice*, 520 U.S. 273, 275 (1997) (emphasis omitted).

2

The NVRA is a comprehensive scheme enacting three significant changes to federal election registration procedures nationwide: (1) it creates a standard "Federal Form" (described below) for registering federal voters; (2) it requires states to establish procedures to register voters for federal elections according to three prescribed methods; and (3) it regulates maintenance of voting lists. *See* 42 U.S.C. § 1973gg *et seq*.

Section 1973gg, setting forth the act's "Findings and Purposes," provides an overview of the NVRA. The "findings" subsection, § 1973gg(a), articulates Congress's intent to promote voter registration and to address "discriminatory and unfair registration laws." The "purposes" subsection,

§ 1973gg(b), provides a preview of the operative sections of the NVRA, listing Congress's goals of increasing voter registration and enhancing the participation of eligible voters (relating to Sections 2 through 5, § 1973gg-2-§ 1973gg-5) and the goals of ensuring the accuracy of registration rolls and protecting the integrity of the electoral process (relating to Section 6, § 1973gg-6).

Section 2, § 1973gg-2, sets forth the scope and applicability of the act.[11] Each state (except for those that do not require voter registration as a prerequisite to voting) "shall establish procedures to register" voters for federal elections according to the NVRA's three methods "notwithstanding any other Federal or State law, in addition to any other method of voter registration provided for under State law." § 1973gg-2(a).

The first method of voter registration is described in Section 3, § 1973gg-3. This section provides that any application for a driver's license submitted to a state motor vehicle authority "shall serve as an application for voter registration with respect to elections for Federal office unless the applicant fails to sign the voter registration application." § 1973gg-3(a)(1). This provision earned the statute its informal title, the "Motor Voter Law." *United States v. Lara*, 181 F.3d 183, 191 (1st Cir. 1999). Under the statute, the voter registration form must be part of the driver's license application, and generally "may not require any information that duplicates information required in the driver's license portion of the form." § 1973gg-3(c)(2)(A). Section 3 also limits the content of the form to the minimum necessary to prevent duplicate voter registrations and to enable the state to assess the eligibility of the applicant.[12]

---

[11]Section 1 of the NVRA defines terms used in the statute. § 1973gg-1.

[12]Section 1973gg-3(c) provides, in pertinent part:

The combined motor vehicle-voter registration form:

(B) may require only the minimum amount of information necessary to—

The second method of voter registration, set forth in Section 4, § 1973gg-4, requires states to register federal voters by mail using the Federal Form. Section 4(a)(1) states that "[e]ach State shall accept and use the [Federal Form] for the registration of voters in elections for Federal office." Section 4(a)(2) provides that, "[i]n addition to accepting and using [the Federal Form], a State may develop and use a mail voter registration form that meets all the criteria" of the Federal Form. Section 4(b) discusses the availability of the Federal Form and the state equivalent: States must make the mail registration form "available for distribution through governmental and private entities, with particular emphasis on making them available for organized voter registration programs." § 1973gg-4(b). With certain exceptions not pertinent here, the statute permits states to require citizens who register by mail to vote in person if they have not previously voted in the jurisdiction. § 1973gg-4(c).

The third method of federal voter registration is mandated by Section 5, § 1973gg-5, which requires states to designate certain state offices for voter registration. Targeting "the poor and persons with disabilities who do not have driver's licenses and will not come into contact with" motor vehicle agencies, H.R. Rep. No. 103-55, at 19 (1993), *as reprinted in* 1993 U.S.C.C.A.N. 140, 144, this section requires states to

---

(I) prevent duplicative voter registrations; and

(ii) enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;

(C) shall include a statement that—

(I) states each eligibility requirement (including citizenship)

(ii) contains an attestation that the applicant meets each such requirement; and

(iii) requires the signature of the applicant under penalty of perjury[.]

provide for federal registration at "all offices in the State that provide public assistance," § 1973gg-5(a)(2)(A), and "all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities," § 1973gg-5(a)(2)(B). The state may also designate additional government offices such as "public libraries, public schools, offices of city and county clerks (including marriage license bureaus), fishing and hunting license bureaus, government revenue offices, unemployment compensation offices, and [other offices] that provides services to persons with disabilities" as voter registration agencies. § 1973gg-5(a)(3).

Section 5 requires each designated agency to provide applicants with the Federal Form, help them complete it, and mandates "[a]cceptance of completed voter registration application forms for transmittal to the appropriate State election official." § 1973gg-5(a)(4)(A). As in Section 4, the designated state agency may also distribute a state form, but only "if it is equivalent" to the Federal Form. § 1973gg-5(a)(6)(A)(ii).

Section 6, § 1973gg-6, establishes procedures to enhance the accuracy and integrity of the official voting lists both by removing ineligible voters and preventing the mistaken removal of eligible voters.

Section 7, § 1973gg-7, describes how the federal and state governments will determine the contents of the Federal Form, and otherwise coordinate administration of the NVRA's procedures. This section delegates the creation of the Federal Form to the federal Election Assistance Commission (EAC).[13] § 1973gg-7(a). The section requires the EAC to work "in con-

---

[13]The responsibilities of the EAC were formerly held by the Federal Election Commission (FEC). When Congress passed the Help America Vote Act (HAVA), Pub. L. No. 107-252, 116 Stat. 1666, in 2002, it created the EAC, 42 U.S.C. § 15321, which eventually absorbed the FEC's duties under the NVRA.

sultation with the chief election officers of the States" in crafting the Form's contents. *Id.*

Section 7 also sets out parameters for what the Federal Form may, shall, and cannot include.[14] Among other things, the Federal Form "may require only such identifying information" as is necessary to allow the state to determine the eligibility of the applicant and to administer the voter registration and election process. § 1973gg-7(b)(1). The Federal Form

[14]The Federal Form:

(1) may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;

(2) shall include a statement that—

(A) specifies each eligibility requirement (including citizenship);

(B) contains an attestation that the applicant meets each such requirement; and

(C) requires the signature of the applicant, under penalty of perjury;

(3) may not include any requirement for notarization or other formal authentication; and

(4) shall include, in print that is identical to that used in the attestation portion of the application—

(I) [voter eligibility requirements and penalties for false applications, § 1973gg-6(a)(5)]

(ii) a statement that, if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes; and

(iii) a statement that if an applicant does not register to vote, the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes.

§ 1973gg-7(b).

must inform the applicant as to every eligibility requirement "including citizenship" and require the applicant to attest, under penalty of perjury, that the applicant meets each requirement. § 1973gg-7(b)(2). The form "may not include any requirement for notarization or other formal authentication." § 1973gg-7(b)(3).

Section 8, § 1973gg-8, requires states to designate an officer to serve as chief election official. Section 9, § 1973gg-9, regulates civil enforcement of the NVRA's provisions and designates a private right of action under the statute. Section 10, § 1973gg-10, sets forth the criminal penalties for election fraud or other non-compliance with the statute.

As this overview indicates, the thrust of the NVRA is to increase federal voter registration by streamlining the registration process. In this vein, the NVRA requires states to make registration opportunities widely available, at the motor vehicle bureau, § 1973gg-3, by mail, § 1973gg-4, and at public assistance, disability service, and other designated state offices, § 1973gg-5. Along with increasing the opportunities for registration, the NVRA eases the burdens of completing registration forms. At the motor vehicle authority, for instance, voter registration must be included as part of the driver's license application and the combined form cannot require duplicative information. § 1973gg-3(c)(2)(A). The NVRA also regulates the Federal Form to meet its goal of eliminating obstacles to voter registration. *See* § 1973gg(b)(1)-(2). Thus, the NVRA forbids the EAC from including any identifying information beyond that "necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." § 1973gg-7(b)(1). In sum, as every court to have considered the act has concluded, the NVRA's central purpose is to increase voter registration by streamlining voter registration procedures. *See, e.g.*, *Harkless*, 545 F.3d at 449; *Welker v. Clarke*, 239 F.3d 596, 598-99 (3d Cir. 2001) ("One of the NVRA's central purposes was to

dramatically expand opportunities for voter registration . . . ."); *Disabled in Action of Metro. N.Y. v. Hammons*, 202 F.3d 110, 114 (2d Cir. 2000); *Lara*, 181 F.3d at 192 ("The NVRA is addressed to heightening overall popular participation in federal elections . . . ."); *Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen*, 152 F.3d 283, 285 (4th Cir. 1998) ("Congress passed the NVRA . . . to encourage increased voter registration for elections involving federal offices" and "to make it easier to register to vote."); *ACORN v. Miller*, 129 F.3d 833, 835 (6th Cir. 1997) ("In an attempt to reinforce the right of qualified citizens to vote by reducing the restrictive nature of voter registration requirements, Congress passed the [NVRA].").

3

Turning now to our Elections Clause analysis, we consider whether Proposition 200's documentary proof of citizenship requirement is superseded by the NVRA. As indicated by the approach derived from *Siebold* and *Foster*, *see supra* Part II.B, we consider the state and federal enactments together as if they composed a single system of federal election procedures. Next, we consider whether, read naturally, the NVRA provisions complement Proposition 200's voter registration requirements or supersede them. If a natural interpretation of the language of the two enactments leads to the conclusion that the state law does not function consistently and harmoniously with the overriding federal scheme, then it is replaced by the federal statute.

**[8]** Applying this framework, we conclude that Proposition 200's documentary proof of citizenship requirement conflicts with the NVRA's text, structure, and purpose. First, the NVRA addresses precisely the same topic as Proposition 200 in greater specificity, namely, the information that will be required to ensure that an applicant is eligible to vote in federal elections. *See Foster*, 522 U.S. at 73. Section 7 of the NVRA, § 1973gg-7, both spells out the information that an

applicant must provide in order to register to vote in a federal election and limits what the Federal Form can require. It "may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant." § 1973gg-7(b)(1). The Federal Form accounts for eligibility concerns by requiring applicants to attest, under penalty of perjury, that they meet every eligibility requirement. § 1973gg-7(b)(2). Acknowledging the states' interests in ensuring voter eligibility, Congress allowed states to give their input on the contents of the Federal Form in an advisory capacity to the EAC. § 1973gg-7(a)(2). Given the NVRA's comprehensive regulation of the development of the Federal Form, there is no room for Arizona to impose sua sponte an additional identification requirement as a prerequisite to federal voter registration for registrants using that form. If viewed as a second enactment by the same legislature, the NVRA clearly subsumes Proposition 200's additional documentary requirement on registrants using the Federal Form. *See Siebold*, 100 U.S. at 384.

**[9]** Further supporting this conclusion, the value of the Federal Form (and hence a centerpiece of the NVRA) would be lost, and Congress's goal to eliminate states' discriminatory or onerous registration requirements vitiated, if we were to agree with Arizona that states could add any requirements they saw fit to registration for federal elections through the Federal Form. For instance, the NVRA prohibits the Federal Form from requiring notarization or other such formal authentication. § 1973gg-7(b)(3). If the NVRA did not supersede additional state requirements on registrants using the Federal Form, as Arizona asserts, then states would be free to impose a notarization requirement as a prerequisite to their "accept-[ance] and use" of the form, *see* § 1973gg-4(a)(1), even though such a requirement would directly contradict Congress's intent in prohibiting such a requirement in the form itself.

**[10]** Moreover, specific statutory language in the NVRA, when read in an unstrained and natural manner, is inconsistent with the state enactment. The NVRA mandates that states "shall accept and use" the Federal Form when applicants register by mail. § 1973gg-4(a). It likewise requires "acceptance" of the completed Federal Form at state office buildings, which must be transmitted to the appropriate State election officials. § 1973gg-5(a)(4)(iii). The state must implement these methods of registering voters, as well as the combined motor vehicle-voter registration form, § 1973gg-3(c)(1), "notwithstanding any other Federal or state law," § 1973gg-2(a). By contrast, Proposition 200 precludes the state from registering applicants who have completed and submitted the Federal Form unless such applicants also mail in, or submit at the designated state office building, documentary proof of citizenship. Ariz. Rev. Stat. §§ 16-152, 16-166. Such a requirement falls under the umbrella of laws displaced by the NVRA's "notwithstanding" language.

Structurally, allowing states to impose their own requirements for federal voter registration on registrants using the Federal Form would nullify the NVRA's procedure for soliciting state input, and aggrandize the states' role in direct contravention of the lines of authority prescribed by Section 7. The NVRA permits states to suggest changes to the Federal Form, but gives the EAC ultimate authority to adopt or reject those suggestions. § 1973gg-7(a). Here, for example, before enacting Proposition 200, Arizona petitioned the EAC to include a requirement in the Federal Form that the applicant present documentary proof of citizenship analogous to what is required by Proposition 200. Pursuant to the procedure set forth in the NVRA, the EAC denied the suggestion and warned that Arizona "may not refuse to register individuals to vote in a Federal election for failing to provide supplemental proof of citizenship, if they have properly completed and timely submitted the Federal Registration Form." Faced with this denial, Arizona proceeded to implement the requirement in Proposition 200 as a separate state condition to voter regis-

tration, which was imposed even on those registering to vote in federal elections with the Federal Form. If the NVRA did not supersede state-imposed requirements for federal voter registration, this type of end-run around the EAC's consultative process would become the norm, and Congress's control over the requirements of federal registration would be crippled. Given that the Elections Clause gives Congress ultimate authority over the federal voter registration process, *Colgrove*, 328 U.S. at 554, such a reading of the NVRA is untenable.

**[11]** More broadly, Proposition 200 is not in harmony with the intent behind the NVRA, which is to reduce state-imposed obstacles to federal registration. It is indisputable that by requiring documentary proof of citizenship, Proposition 200 creates an additional state hurdle to registration. As indicated in our overview, *supra* Part C.2, the NVRA was sensitive to the multiple purposes of a federal voter registration scheme, including the need "to establish procedures that [would] increase the number of eligible citizens who register to vote in elections for Federal office" and the need to protect "the integrity of the electoral process." § 1973gg(b). The balance struck by the EAC pursuant to § 1973gg-7(a) was to require applicants to attest to their citizenship under penalty of perjury, but not to require the presentation of documentary proof. *Id.* Proposition 200's additional requirement is not consistent with this balance.

Arizona argues that Proposition 200 does not conflict with the NVRA because the NVRA nowhere expressly precludes states from imposing requirements in addition to those of the Federal Form. Focusing on the phrase in the NVRA Section 4 which requires states to "accept and use" the Federal Form to register mail applicants, *see* § 1973gg-4(a)(1), Arizona argues that its registration process complies with the NVRA because the state makes the Federal Form available to applicants, and will accept the Form so long as it is accompanied by documentary proof of citizenship.

**[12]** Like the petitioners in *Foster*, Arizona has offered a creative interpretation of the state and federal statutes to avoid a direct conflict. *See Foster*, 522 U.S. at 72. But as *Foster* counsels, we do not strain to reconcile the state's federal election regulations with those of Congress under the Elections Clause; rather, we consider whether the additional registration requirement mandated by Proposition 200 is harmonious with the procedures mandated by Congress under a natural reading of the statutes. *See id.* at 74; *Siebold*, 100 U.S. at 384. As explained above, allowing Arizona to impose Proposition 200's registration provisions on top of the Federal Form conflicts with the NVRA's purpose, procedural framework, and the specific requirement that states use the Federal Form or its equivalent, "notwithstanding any other state or federal law," § 1973gg-2(a). Under Congress's expansive Elections Clause power, we must hold Arizona's documentary proof of citizenship requirement, Ariz. Rev. Stat. §§ 16-152(A)(23), 16-166(F), superseded by the NVRA.[15]

4

Arizona's remaining arguments do not persuade us to reach

---

[15]Because we reach our conclusion based on the language and structure of the statute, we do not rely on the EAC's interpretation of the NVRA or the NVRA's legislative history. Because the parties argue the import of these sources, we merely note that both are consistent with our holding. As discussed *supra* page 17654, the EAC construes the NVRA as not permitting states to "condition acceptance of the Federal Form upon receipt of additional proof." With respect to legislative history, the NVRA's Conference Report, which we have held is the most authoritative and reliable legislative material, *see, e.g.*, *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 835 (9th Cir. 1996), shows that Congress rejected an amendment to the NVRA which would have provided that "nothing in this Act shall prevent a State from requiring presentation of documentation relating to citizenship of an applicant for voter registration," H.R. Rep. No. 103-66, at 23 (1993). The conferees explained that the amendment was not "consistent with the purposes of" the NVRA and "could effectively eliminate, or seriously interfere with, the mail registration program of the Act." *Id.*

a different conclusion. First, Arizona contends that an interpretation of the NVRA that precludes states from imposing additional voter registration requirements for federal elections is unreasonable because Congress could not have intended states to register "any and all" applicants who submit the Federal Form without any outlet for the states to check those applicants' qualifications. Arizona asserts that because the act contemplates that some applications will be rejected, *see* § 1973gg-6(a)(2) (which requires states to notify "each applicant of the disposition of the application"), the NVRA cannot require states to automatically register every individual using the Federal Form.

This argument reflects a misunderstanding of the NVRA. As Section 6 demonstrates, states need not register every applicant who completes and submits the Federal Form. *See* § 1973gg-6(a)(2). Voters still have to prove their eligibility pursuant to the Federal Form. Contrary to Arizona's assertion, the NVRA does not require states to register applicants who are ineligible, or whose forms are incomplete, inaccurate, or illegible.

Second, Arizona argues that states must have freedom to exercise their own methods for determining voter eligibility as a protection against voter fraud. In *ACORN v. Edgar*, the Seventh Circuit considered and discarded a similar argument. In that case, the state claimed that the "Motor Voter" component of the NVRA "opens the door to voter fraud." 56 F.3d at 795. The court rejected the argument in part because "federal law contains a number of safeguards against vote fraud, and it is entirely conjectural that they are inferior to the protections that [state] law offers." *Id.* at 795-96 (citation omitted).

We reach the same conclusion here. Congress was well aware of the problem of voter fraud when it passed the NVRA, as evidenced by the numerous fraud protections built into the act. For one, Section 10 applies federal criminal penalties to persons who knowingly and willingly engage in

fraudulent registration tactics. § 1973gg-10(2). Second, Sections 3 and 7 require the Federal Form and the combined motor vehicle-voter registration form to contain an attestation clause that sets out the requirements for voter eligibility. §§ 1973gg-3(c)(2)(C)(i)-(ii), 1973gg- 7(b)(2)(A)-(B). Applicants are required to sign these forms under penalty of perjury. §§ 1973gg-3(c)(2)(C)(iii), 1973gg-7(b)(2)(C). Third, Section 4 permits states to verify the eligibility and identity of voters by requiring first-time voters who register by mail to appear at the polling place in person, where the voter's identity can be confirmed. § 1973gg-4(c). Last, Section 6 requires states to give notice to applicants of the disposition of their registration, which states may use as a means to detect fraudulent registrations. *See* § 1973gg-6(a)(2). Because Congress dealt with the issue of voter fraud in the NVRA, we are not persuaded by Arizona's claim that states must be permitted to impose additional requirements to address the same issue.

Third, Arizona suggests that Congress's enactment of HAVA, 42 U.S.C. § 15301 *et seq.*, which Congress passed after the NVRA, provides a gloss on the NVRA's meaning. According to Arizona, HAVA demonstrated Congress's intent to permit states to ensure the eligibility of voter registrants, and made clear that states could exceed the minimum requirements of the NVRA in carrying out their registration functions.

We disagree. Congress enacted HAVA in reaction to the 2000 Presidential election and the ensuing controversial Florida recount. *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1155 (11th Cir. 2008). The NVRA and HAVA operate in separate spheres: while the NVRA regulates voter registration, HAVA is concerned with updating election technologies and other election-day issues at polling places.

As relevant here, HAVA interacts with the NVRA only on a few discrete issues. First, HAVA added two check-boxes to

the Federal Form, requiring applicants to check off whether they are citizens of the United States and whether they are old enough to vote. 42 U.S.C. § 15483(b)(4).

Second, HAVA permits mail registrants who have not previously voted in a federal election to submit documents verifying their identity along with the Federal Form. § 15483(b)(3). First-time voters who take advantage of this provision do not have to show their identification when they arrive at the polling place, *id.*, a step that the states may otherwise require under the NVRA, *see* § 1973gg-4(c). This option is not, however, a prerequisite to successful registration, as applicants who choose not to submit documentation may still be registered.

Third, HAVA requires states to assign each registrant a "unique identifier" capable of being cross-checked against voters' identities at the polls. § 15483(a)(1)(A). HAVA provides that the unique identifier may be the applicant's driver's license number or the last four digits of the applicant's social security number. *See* § 15483(a)(5)(A). But nothing in HAVA allows the state to require these forms of identification as a prerequisite to registration. Rather, if the applicant possesses neither a driver's license nor social security card, HAVA requires the state to assign the applicant "a number which will serve to identify the applicant for voter registration purposes." § 15483(a)(5)(A)(ii). The unique identifier is not used to check the citizenship of the registrant, but rather to ensure that the voter who appears at the polls is the same person who registered to vote.

Nor does HAVA allow states to exceed the voter registration requirements set forth in the NVRA. In making this argument, Arizona points to the provision in HAVA stating that:

> The requirements established by this title are minimum requirements and nothing in this title shall be construed to prevent a State from establishing elec-

tion technology and administration requirements that are more strict than the requirements so long as such State requirements are not inconsistent with the Federal requirements under this subchapter or any law [including the NVRA and other federal voting regulations, § 15545].

§ 15484. But the "election technology and administration requirements" referenced in this section refer to HAVA's requirements that states update election equipment (such as by replacing punch card voting systems) and meet other voting system standards. While § 15484 permits states to institute their own technological and administrative improvements, it does not allow them to impose additional requirements on the voter registration process established by the NVRA. Indeed, the section itself precludes states from adding requirements "inconsistent with the Federal requirements under" the NVRA. § 15484. Moreover, HAVA expressly provides that "nothing [in HAVA] may be construed to authorize or require conduct prohibited under [the NVRA]." § 15545(a)(4). This language indicates Congress's intent was to prevent HAVA from interfering with NVRA's comprehensive voter registration system. Accordingly, Arizona's reliance on HAVA is unavailing.

### D

**[13]** Finally, Arizona argues that we are foreclosed from reviewing Gonzalez's NVRA claim because the prior panel's ruling in *Gonzalez I*, which occurred at the preliminary injunction phase of this case, already decided that the NVRA does not supersede the changes to Arizona's registration system under Proposition 200. *See Gonzalez I*, 485 F.3d at 1050-51. Arizona asserts that this prior ruling is dispositive, and there is no ground for the court to reconsider the issue here.

**[14]** Addressing this argument requires us to review the applicability of our law of the case doctrine.[16] Under this doctrine, "one panel of an appellate court will not as a general rule reconsider questions which another panel has decided on a prior appeal in the same case." *Hegler v. Borg*, 50 F.3d 1472, 1475 (9th Cir. 1995) (citation and internal quotation marks omitted). The doctrine applies to prior decisions based on pure issues of law, even those made, as here, in the preliminary stages of review of the same case. *See Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1114 (9th Cir. 2007).

**[15]** "The effect of the doctrine is not dispositive, particularly when a court is reconsidering its own judgment, for the law of the case 'directs a court's discretion, it does not limit the tribunal's power.' " *Mendenhall v. Nat. Transp. Safety Bd.*, 213 F.3d 464, 469 (9th Cir. 2000) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). In other words, "there is nothing in the Constitution of the United States to require [invocation of the doctrine], or to prevent a [court] from allowing a past action to be modified while a case remains in court." *King v. West Virginia*, 216 U.S. 92, 101 (1910). Instead, the doctrine's utility is typically prudential: "it's a courteous and efficient way for a court to say 'enough's enough' when litigants seek reconsideration of prior interlocutory decisions." *Jeffries v. Wood* (*Jeffries V*), 114 F.3d 1484, 1509 (9th Cir. 1997) (en banc) (Kozinski, J., dissenting) (citing cases), *overruled on other grounds by Lindh v. Murphy*, 521 U.S. 320 (1997).

---

[16]Law of the case is part of a related set of preclusion principles that includes stare decisis, res judicata, and collateral estoppel. 3 James Wm. Moore et al., Moore's Manual: Federal Practice & Procedure, § 30.01. Though linked by the general animating purpose of judicial efficiency, these principles are distinguished by the type or stage of litigation in which they separately apply, and as a consequence each has its own policy considerations. *Id.*

That said, the policies animating the law of the case doctrine are undeniably fundamental. The doctrine "promotes the finality and efficiency of the judicial process by protecting against the agitation of settled issues." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (internal quotation marks omitted). These are paramount concerns to sound judicial administration, as "[a]n appellate court cannot efficiently perform its duty to provide expeditious justice to all if a question once considered and decided by it were to be litigated anew in the same case upon any and every subsequent appeal." *Kimball v. Callahan*, 590 F.2d 768, 771 (9th Cir. 1979) (internal quotation marks omitted).

Balanced against these valid concerns, however, are equally strong considerations that occasionally pull in the opposite direction. We have held that the "[l]aw of the case should not be applied woodenly in a way inconsistent with substantial justice." *United States v. Miller*, 822 F.2d 828, 832 (9th Cir. 1987); *see also Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 602 (9th Cir. 1991) ("[T]he law of the case is an equitable doctrine that should not be applied if it would be unfair."); *Loumar, Inc. v. Smith*, 698 F.2d 759, 762 (5th Cir. 1983) ("The law of the case doctrine is not . . . a barrier to correction of judicial error. It is a rule of convenience and utility and yields to adequate reason . . . ."). Interests of efficiency and finality clash with the responsibility of the court to not issue judgments known to be wrong on the facts or law.

[16] As a compromise between these sometimes countervailing interests, we have identified three exceptional circumstances in which, on balance, we deem the concerns of finality and efficiency outweighed. Law of the case should not operate as a constraint on judicial review where "(1) the decision is clearly erroneous and its enforcement would work a manifest injustice,[17] (2) intervening controlling authority makes

---

[17]As has been noted in prior cases, "[f]or some time, there have existed in the Ninth Circuit two different formulations of the set of circumstances

reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial." *Jeffries V*, 114 F.3d at 1489 (internal quotation marks and footnote omitted). Here, Gonzalez argues that the first exception applies. We agree.

The prior panel's conclusion that the NVRA permits state-imposed documentary proof of citizenship requirements on registrants using the Federal Form was based on three provisions of the statute. First, the panel indicated that under the NVRA states must "either 'accept and use the mail voter registration form prescribed by the Federal Election Commission' or, in the alternative, 'develop and use [their own] form,' as long as the latter conforms to the federal guidelines." *Gonzalez I*, 485 F.3d at 1050 (second alteration in original) (citations omitted). Second, the panel asserted that the NVRA "prohibits states from requiring the form to be notarized or otherwise formally authenticated." *Id.* Last, the panel described the NVRA as "permit[ting] states to 'require[ ] such identifying information . . . as is necessary to enable . . . election official[s] to assess the eligibility of the applicant." *Id.* (alterations in original). Construing these provisions together, the panel concluded that the statute plainly contemplates allowing states to require voters to present at least some evidence of citizenship at the time of registration. *Id.* at 1050-51.

---

in which a court may decline to follow the law of the case. The first formulation . . . states that a court may depart from the law of the case if 'the previous decision is clearly erroneous and its enforcement would work a manifest injustice.' In contrast, the second formulation states that a court may decline to follow the law of the case if 'the first decision was clearly erroneous' *or* 'a manifest injustice would otherwise result." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg. Planning Agency*, 216 F.3d 764, 787 n.43 (9th Cir. 2000) (citations and brackets omitted), *aff'd on other grounds*, 535 U.S. 302 (2002); *see also Mendenhall*, 213 F.3d at 469 & n.2. As in the other cases noting but not resolving this apparent conflict, we need not settle this issue in the present case, because there are grounds to satisfy the exception under either formulation of the standard.

**[17]** As may be apparent from our NVRA analysis *supra*, the prior panel's conclusion was rooted in a fundamental misreading of the statute. As the dissent acknowledges, *see* Dissent at 17694-95, the NVRA does not give states freedom "either" to accept and use the Federal Form "or, in the alternative," develop their own form. *See id.* Rather, the NVRA commands without exception that states "shall" accept and use the Federal Form, and if they develop their own form, it can be used only "in addition to" accepting and using the Federal Form, and still must meet all of the criteria of Section 7. *See* § 1973gg-4(a). Thus, while Section 4 of the NVRA applies the limitations of Section 7(b) to the states with respect to the creation of their own state forms, nothing in the text or structure of either provision supports reading Section 7(b) as giving the states any authority over or discretion to modify the Federal Form. Insofar as the prior panel referred to portions of the NVRA that relate to the Federal Form, *see Gonzalez I*, 485 F.3d at 1050, those excerpts are directed solely at the EAC, not the states. *See* § 1973gg-7(a)-(b). These provisions cannot be said to "plainly allow states . . . to require their citizens to present evidence of citizenship when registering to vote" for federal elections via the Federal Form. *Id.* at 1050-51.

The dissent takes issue with our analysis of the prior panel's opinion, suggesting that the panel may have been using "either . . . or, in the alternative" in a conjunctive sense. Dissent 17693-95. We disagree. The prior panel's statement that states can "*either* accept and use" the Federal Form "*or, in the alternative*" develop and use their own form cannot reasonably be interpreted to mean that states can *both* accept and use the Federal Form *and also* develop and use their own form. Indeed, such an interpretation would be contrary to the prior panel's logic; the prior panel based its conclusion that states could require registrants using the Federal Form to show additional identification on the ground that states could require use of their own forms in lieu of the Federal Form.

As another basis for upholding the prior panel's opinion, the dissent suggests that the prior panel's conclusion was correct although its reasoning was erroneous, because "accept and use" in § 1973gg-4(a)(1) can be read to mean "accept . . . for a particular purpose [but] not have it be sufficient to satisfy that purpose." Dissent 17697. In other words, the dissent argues that although states are required to "accept and use" the Federal Form, the NVRA leaves them free to require prospective voters to comply with additional registration requirements beyond those mandated by the Federal Form. As noted above, Arizona makes a similar argument. This argument is inconsistent with the language and structure of the NVRA. The dissent's strained interpretation would make the EAC's procedure for consultation and development of the Federal Form under Section 7(a) an empty exercise, because any state could require registrants to comply with additional state requirements even if they register with the Federal Form. As discussed above, under an Elections Clause framework, we do not strain the language of the NVRA to render it harmonious with Proposition 200. In the context of the NVRA, "accept and use" can mean only one thing: the states must "accept and use" the Federal Form as a fully sufficient means of registering to vote in federal elections.

[18] Reasoning from a fundamental misreading of the statute, the prior panel reached a conclusion that was clear error. *See Jeffries V*, 114 F.3d at 1489. The text, structure, and purpose of the NVRA simply cannot bear the prior panel's interpretation. Moreover, this case represents an "exceptional circumstance," where the effect of the erroneous decision, were it to stand, would result in a manifest injustice. *Id.* at 1489, 1492. Not only does the erroneous conclusion impede the implementation of a major congressional enactment, but it poses a significant inequity to citizens who are required under the state law to navigate obstacles that do not exist under federal law in pursuit of their fundamental right to vote. *See id.* at 1492 (stating that manifest injustice may be found where the challenged decision involves a "significant inequi-

ty"). Though we are sensitive to the cautious approach courts should take in deciding to alter an earlier panel's decision, because the prior decision in this case not only reached a clearly erroneous result, but reached that result on the basis of a misconstruction of the statute, we are convinced that there are appropriately exceptional circumstances to review the decision here.

The fact that the prior panel's decision was contained in a published opinion does not strip us of our discretion to review its conclusions, because no subsequent published decision has relied upon the prior panel's decision for the proposition to be overturned. *See, e.g., Mendenhall*, 213 F.3d at 469 (reversing a prior published appellate opinion as clearly erroneous under the exceptions to the law of the case); *Tahoe-Sierra*, 216 F.3d at 786-87 (same). Under such circumstances, the law of the circuit doctrine does not preclude us from revising prior decisions in the same case under the established exceptions to the law of the case. *See Jeffries V*, 114 F.3d 1484.

This conclusion was made clear in *Jeffries V*, an en banc decision highlighting the workings of our law of the case doctrine. Although the procedural history of the *Jeffries* decisions is complex,[18] the central question addressed in *Jeffries V* was

---

[18]The *Jeffries* decisions were a series of five opinions in response to a habeas petition by Patrick Jeffries. Jeffries had been sentenced to death by a jury, but petitioned for relief on the ground of juror misconduct (he claimed that one juror had informed other jurors that Jeffries was a convicted armed robber). The district court rejected this claim on the ground that even if true, this fact would not have affected the verdict. On appeal, a panel of this court initially upheld the district court's conclusion, *Jeffries v. Blodgett* (*Jeffries I*), 974 F.2d 1179 (9th Cir. 1992), but then granted Jeffries's petition for rehearing and itself on the ground that *Jeffries I* conflicted with precedent. *Jeffries v. Blodgett* (*Jeffries II*), 988 F.2d 923 (9th Cir. 1993). The panel then rejected the state's petition for rehearing, but amended *Jeffries II* to make clear that the claim of juror misconduct, if true, would have had a "substantial and injurious effect" on the verdict. *Jeffries v. Blodgett* (*Jeffries III*), 5 F.3d 1180 (9th Cir. 1993). On remand,

whether *Jeffries IV*, 75 F.3d 491, erred in its application of an exception to the law of the case. The *Jeffries IV* panel held that it could reverse its prior holding in *Jeffries III*, 5 F.3d 1180, under the first exception to the law of the case , because *Jeffries III* was "clearly erroneous and would work a manifest injustice." *Jeffries IV*, 75 F.3d at 494. In *Jeffries V*, we rejected the state's argument that we should avoid reaching the law of the case issue and instead decide the case on the merits, due to the importance of the law of the case doctrine to our jurisprudence. *See* 114 F.3d at 1492. After a careful review of the law of the case doctrine, we concluded in *Jeffries V* that the *Jeffries IV* panel had erred in overturning *Jeffries III*, because none of the exceptions to the law of the case were applicable. *Id.* at 1489. Focusing on the first exception, *see id.* at 1489 n.2, we concluded that *Jeffries III* was not clearly erroneous, and would not work a manifest injustice, and accordingly *Jeffries IV* had erred in reversing it. *Id.* at 1489.

The decision in *Jeffries V* was also supported on stare decisis grounds. Noting that two Ninth Circuit panels had already relied on *Jeffries III* at the time *Jeffries IV* was decided, *see Thompson v. Borg*, 74 F.3d 1571, 1575 n.1 (9th Cir. 1996); *Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995), we stated that a panel "must be exceedingly careful in altering the law of its earlier opinion" in circumstances "when subsequent

---

the district court held that juror misconduct had in fact occurred and granted Jeffries's petition. *See Jeffries V*, 114 F.3d at 1488. After the state appealed this ruling, the panel again reversed itself, holding that it had interpreted precedent too broadly in *Jeffries III*, and that the law of the case did not prevent reversal of *Jeffries III* because that decision was "clearly erroneous and would work a manifest injustice." *See Jeffries v. Wood* (*Jeffries IV*), 75 F.3d 491 (9th Cir. 1996). Accordingly, the panel reinstated its denial of Jeffries's habeas petition. Jeffries petitioned for rehearing en banc, which we granted to determine, among other things, whether *Jeffries IV* had erred in reversing *Jeffries III*. *See Jeffries V*, 114 F.3d at 1488.

panels have relied on the initial decision" because "[o]therwise, intra-circuit conflict may arise, posing serious difficulties." *Jeffries V*, 114 F.3d at 1492. Moreover, we noted that "to reach its decision properly, the *Jeffries IV* panel would have had to reverse *Lawson*," which could not properly be done by a three-judge panel. *Id.* In explaining the effect of prior published opinions on the applicability of our exceptions to the law of the case, the en banc court in *Jeffries V* notably did not adopt the view of the dissent in that case that "no three-judge panel may reconsider a rule of law embodied in a prior published opinion," even one in the same case, *Jeffries V*, 114 F.3d at 1511 (Kozinski, J., dissenting). In sum, under our en banc decision in *effries V*, though a panel cannot overturn prior published opinions in different cases, it may overturn a prior published opinion in the same case if the exceptions to the law of the case are applicable.

**[19]** In this case, no other panel of this court has relied upon the prior panel's decision for the proposition that the NVRA does not supersede additional state requirements for federal voter registration. Where no subsequent opinion has relied on the prior published opinion for the proposition to be overturned, there is no *stare decisis* problem and consequently the law of the circuit doctrine does not prohibit revising the prior opinion.

Despite our decision in *Jeffries V*, the dissent argues that we are bound by a rule that we can never reverse a prior published opinion, even one in the same case. Dissent 17684-85. On its face, this is the same rule that was proposed in the *Jeffries V* dissent and rejected by the majority. To overcome this obstacle, the dissent claims that a footnote in *United States v. Washington (Washington IV)*, 593 F.3d 790 (9th Cir. 2010) (en banc), overruled *Jeffries V* on this issue. Dissent 17685.

We disagree. *Washington IV* was heard en banc to resolve an inconsistency between two conflicting lines of precedent on the question whether federal recognition of a tribe has a

bearing on that tribe's entitlement to fishing rights under a specific treaty. *See* 593 F.3d at 792-93, 798. In *United States v. Washington* (*Washington III*), 394 F.3d 1152 (9th Cir. 2005), we held that the intervening federal recognition of a tribe "was a *sufficient* condition for the establishment of treaty fishing rights." *Id.* at 1158. But in *Greene v. United States (Greene I)*, 996 F.2d 973, 976-77 (9th Cir. 1993), and *Greene v. Babbitt (Greene II)*, 64 F.3d 1266, 1270-71 (9th Cir. 1995), we held that federal recognition of a tribe could have no effect on treaty fishing rights. On appeal from the district court's decision following *Washington III*, we explained that "the conflict in our precedent led us to rehear the matter en banc without awaiting a three-judge decision." *Washington IV*, 593 F.3d at 798 n.9. This is correct: a three-judge panel could not have resolved the split between *Washington III* and *Greene I* and *II*. The footnote on which the dissent relies further explained that en banc review was necessary because, "[e]ven if the panel could have revisited *Washington III* under one of the exceptions to the law of the case, it still would have been bound by that published opinion as the law of the circuit . . . '[W]e have no discretion to depart from precedential aspects of our prior decision . . . under the general law-of-the-circuit rule.' " *Washington IV*, 593 F.3d at 798 n.9 (citations omitted) (quoting *Old Person v. Brown*, 312 F.3d 1036, 1039 (9th Cir. 2002)).

In light of the detailed discussion in *Jeffries V* regarding exceptions to the law of the case doctrine, we cannot read this sentence as overruling this longstanding doctrine. While *Jeffries V* was expressly decided on the law-of-the-case ground, nothing in *Washington IV* turned on the law of the case doctrine. Nor did *Washington IV* expressly consider or overrule our en banc decision in *Jeffries V*. "In our circuit, statements made in passing, without analysis, are not binding precedent." *Thacker v. FCC (In re Magnacom Wireless, LLC)*, 503 F.3d 984, 993-94 (9th Cir. 2007); *see also United States v. Johnson*, 256 F.3d 895, 915 (9th Cir. 2001) (en banc) (Kozinski, J,. concurring) ("Of course, not every statement of law in

every opinion is binding on later panels. Where it is clear that a statement is made casually and without analysis, where the statement is uttered in passing without due consideration of the alternatives, or where it is merely a prelude to another legal issue that commands the panel's full attention, it may be appropriate to re-visit the issue in a later case."). The *Washington IV* footnote on which the dissent relies neither exhibits "reasoned consideration" of our law of the case doctrine, *Johnson*, 256 F.3d at 914, nor discusses an issue "germane," *id.*, to the resolution of *Washington IV*. In fact, it can more accurately be described as informational, "casual[,] and without analysis," *id.* at 915. Moreover, the *Washington IV* footnote is silent on the question whether subsequent published opinions had relied on *Washington III*, which *Jeffries V* held could preclude an application of the exceptions to the law of the case. *Jeffries V*, 114 F.3d at 1489. Accordingly, we decline to hold that this footnote overruled *sub silentio* the reasoned analysis of the en banc court in *Jeffries V*.[19]

[20] Because, as set forth above, the prior panel's decision on the NVRA issue meets the standard of a recognized law of the case exception, we have discretion to review that decision, and we have chosen to exercise that discretion here.

E

Perhaps the instructions to the Federal Form put it best in stating: "you can use the application in this booklet to: Register to vote in your State." Under the NVRA, prospective voters seeking to register in federal elections need only complete and submit the Federal Form. If this sounds simple, it is by

---

[19]The other cases cited by the dissent in support of its version of the law of the circuit doctrine were decided by three-judge panels and thus could not have overruled *Jeffries V. See Minidoka Irrigation Dist. v. Dep't of Interior*, 406 F.3d 567 (9th Cir. 2005); *Old Person,* 312 F.3d 1036; *Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996). One of these cases also pre-dated *Jeffries. See Hilao*, 103 F.3d 767.

design. Congress enacted the NVRA to increase federal registration by streamlining the registration process and eliminating complicated state-imposed hurdles to registration, which it determined were driving down voter turnout rates. Proposition 200 imposes such a hurdle. In light of Congress's paramount authority to "make or alter" state procedures for federal elections, *see Foster*, 522 U.S. at 69; *Siebold*, 100 U.S. at 371, we hold that the NVRA's comprehensive regulation of federal election registration supersedes Arizona's documentary proof of citizenship requirement, Ariz. Rev. Stat. §§ 16-152(A)(23), 16-166(F).

Because we hold Arizona's registration requirement void under the NVRA, we need not reach Gonzalez's claim that the documentary proof of citizenship requirement imposes greater burdens of registration on naturalized citizens than on non-naturalized citizens and burdens the fundamental right to vote in violation of the Fourteenth Amendment's Equal Protection Clause.

## III

**[21]** The remainder of our analysis focuses solely on the validity of Arizona's polling place provision, Ariz. Rev. Stat. § 16-579.[20] That statute requires voters to show proof of identification before voting at the polls. *Id.* We first consider Gonzalez's appeal from the district court's decision that

---

[20]Because Congress's authority under the Elections Clause is limited to preempting regulations related to federal elections, our holding invalidating Proposition 200's registration requirement does not prevent Arizona from applying its requirement in state election registrations. However, Arizona has presented its system of voter registration under Proposition 200 as concurrently registering voters for state and federal elections, and has not indicated that, in the event Gonzalez prevails on the NVRA claim, it plans to establish a separate state registration system. We therefore do not consider whether Proposition 200's registration requirement, as applied only to state registrations, is valid under Gonzalez and ITCA's remaining claims.

Proposition 200 does not violate § 2 of the VRA, 42 U.S.C. § 1973.

A

**[22]** Section 2(a) of the VRA prohibits states from imposing voting qualifications that result in the "denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a). A violation of § 2 is established "if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of a protected class "in that its members have less opportunity than other members of the electorate [1] to participate in the political process and [2] to elect representatives of their choice." § 1973(b). Said otherwise, a plaintiff can prevail in a § 2 claim only if, "based on the totality of the circumstances, the challenged voting practice results in discrimination on account of race."[21] *Farrakhan v. Washington*, 338 F.3d 1009, 1015 (9th Cir. 2003); *see also United States v. Blaine Cnty., Mont.*, 363 F.3d 897, 903 (9th Cir. 2004). A violation of Section 2 does not require a showing of discriminatory intent, only discriminatory results. *See Chisom v. Roemer*, 501 U.S. 380, 383 (1991); *Ruiz v. City of Santa Maria*, 160 F.3d 543, 557 (9th Cir. 1998).

In applying the totality of the circumstances test, "a court must assess the impact of the contested structure or practice on minority electoral opportunities on the basis of objective factors." *Thornburg v. Gingles*, 478 U.S. 30, 44 (1986) (internal quotation marks omitted). In conducting a § 2 analysis, courts are required to make a "searching inquiry" into "how the challenged [state] practice interacts with social and histor-

---

[21]This approach applies both to claims of vote denial and of vote dilution. *Smith v. Salt River Project Agric. Improvement & Power Dist.*, 109 F.3d 586, 596 n.8 (9th Cir. 1997).

ical conditions to cause an inequality in the opportunities enjoyed by" minorities in the electoral process. *Farrakhan*, 338 F.3d at 1016, 1020 (internal quotation marks omitted). In *Gingles*, the Supreme Court cited a non-exhaustive list of nine factors (generally referred to as the "Senate Factors" because they were discussed in the Senate Report on the 1982 amendments to the VRA) that courts should consider in making this totality of the circumstances assessment. 478 U.S. at 44-45. Relevant here, the factors direct courts to consider the history of official state discrimination against the minority with respect to voting, the extent to which voting in the state is racially polarized, and "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." *Id.* at 36-37 (quoting S. Rep. No. 97-417, at 28-29 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 206-07). "[T]here is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Farrakhan v. Gregoire*, 590 F.3d 989, 999 (9th Cir. 2010) (internal quotation marks omitted).

Gonzalez alleges that Proposition 200's registration and polling place identification requirements violate § 2 by disparately affecting Latino voters, unlawfully diluting their right to vote and providing them with less opportunity than other members of the electorate to participate in the political process. Considering statistical evidence on the existence of disparate impact on Latino registrants and voters, the district court determined that the limited statistical disparity between the Latinos' registration and voting as compared to the rest of the electorate was not statistically significant. Turning to the Senate Factors listed above, the district court found that Latinos had suffered a history of discrimination in Arizona that hindered their ability to participate in the political process fully, that there were socioeconomic disparities between

Latinos and whites in Arizona, and that Arizona continues to have some degree of racially polarized voting.

Despite the presence of limited statistical disparity and some of the Senate Factors, however, the district court concluded that Gonzalez's claim failed because there was no proof of a causal relationship between Proposition 200 and any alleged discriminatory impact on Latinos. The district court noted that not a single expert testified to a connection between the requirement that Latinos show identification under Proposition 200 and the observed difference in voter registration and voting rates of Latinos. Furthermore, the district court held that Gonzalez failed to explain how Proposition 200's requirements interact with the social and historical climate of discrimination to impact Latino voting in Arizona. Without a causal link between the voting practice and prohibited discriminatory result, the district court concluded that Gonzalez had not proven that Proposition 200 results in discrimination "on account of race or color," and that the claim must therefore be denied.

B

Because a § 2 analysis requires the district court to engage in a "searching practical evaluation of the past and present reality," *Gingles*, 478 U.S. at 45 (internal quotation marks omitted), a district court's examination is "intensely fact-based and localized," *Salt River*, 109 F.3d at 591. We therefore "[d]efer[ ] to the district court's superior fact-finding capabilities," *id.*, and review for clear error the district court's findings of fact, including its ultimate finding whether, under the totality of the circumstances, the challenged practice violates § 2, *Old Person v. Cooney*, 230 F.3d 1113, 1119 (9th Cir. 2000) (citing *Gingles*, 478 U.S. at 78-79). We review de novo the district court's legal determinations and mixed findings of law and fact. *Salt River*, 109 F.3d at 591. Again, because we have held that Proposition 200's voter registration requirements are superseded by the NVRA, *supra* Part II, we

consider only Proposition 200's requirement that voters show identification at the polls, Ariz. Rev. Stat. § 16-579.

**[23]** The district court did not clearly err in concluding that Gonzalez failed to establish that Proposition 200's requirements caused any disparate impact on Latinos. To prevail under § 2, a plaintiff must prove "a causal connection between the challenged voting practice and a prohibited discriminatory result." *Salt River*, 109 F.3d at 595 (alteration omitted). "[A] bare statistical showing of disproportionate *impact* on a racial minority does not satisfy the § 2 'results' inquiry." *Id.* at 595 (emphasis in original) (collecting cases). To prove that such a causal relationship exists, a plaintiff need not show that the challenged voting practice caused the disparate impact by itself. *See Farrakhan*, 338 F.3d at 1018-19. Rather, pursuant to a totality of the circumstances analysis, the plaintiff may prove causation by pointing to the interaction between the challenged practice and external factors such as surrounding racial discrimination, and by showing how that interaction results in the discriminatory impact. *Id.* at 1019. But even under this broad totality of the circumstances analysis, the causation requirement is crucial: a court may not enjoin a voting practice under § 2 unless there is evidence that the practice results in a denial or abridgement of the rights of a citizen on account of race or color. § 1973(a). If there is no evidence that the voting practice resulted in any such disparate impact, there is no violation and thus no basis for injunctive relief.

**[24]** The district court correctly applied this standard here. The challenged practice at issue is Proposition 200's requirement that voters show identification at the polls. To prove causation, Gonzalez had to establish that Proposition 200's requirement that voters must produce forms of identification, as applied to Latinos, resulted in a prohibited discriminatory result. Here, Gonzalez alleged in his complaint that "Latinos, among other ethnic groups, are less likely to possess the forms of identification required under Proposition 200 to . . .

cast a ballot," but produced no evidence supporting this allegation. The record does include evidence of Arizona's general history of discrimination against Latinos and the existence of racially polarized voting. But Gonzalez adduced no evidence that Latinos' ability or inability to obtain or possess identification for voting purposes (whether or not interacting with the history of discrimination and racially polarized voting) resulted in Latinos having less opportunity to participate in the political process and to elect representatives of their choice. Without such evidence, we cannot say that the district court's finding that Gonzalez failed to prove causation was clearly erroneous. Therefore we affirm the district court's denial of this claim.[22]

IV

*Gonzalez I*, which considered Gonzalez and ITCA's appeal from the district court's denial of a preliminary injunction, concluded that Arizona's registration identification requirement was not a poll tax. *See* 485 F.3d at 1049. We held that the registration requirement did not (1) force voters "to choose between paying a poll tax and providing proof of citizenship when they register to vote," the standard set forth in *Harman v. Forssenius*, 380 U.S. 528, 541-42 (1965); and did not (2) "make[ ] the affluence of the voter or payment of any fee an electoral standard," as was held impermissible under the Fourteenth Amendment in *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 666 (1966). *Gonzalez I*, 485 F.3d at 1049 (internal quotation marks omitted) (brackets in original).

[25] Here, Gonzalez and ITCA argue that Proposition 200 imposes an unconstitutional poll tax in violation of the

---

[22]Gonzalez also argues that the district court erred in evaluating one of the Senate Factors and in concluding that the disparate impact on Latinos was statistically insignificant. Because Gonzalez's failure to show causation is dispositive, however, we need not reach these issues.

Twenty-fourth Amendment. Separately, ITCA asserts that Proposition 200 is also a poll tax under the Fourteenth Amendment. Guided by the analysis in *Gonzalez I*, we conclude that Proposition 200's polling place identification requirement is not a poll tax under either constitutional provision.

A

The Twenty-fourth Amendment provides that:

> The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States for or any State by reason of failure to pay any poll tax or other tax.

U.S. Const. amend. XXIV.

Gonzalez does not argue that requiring voters to show identification at the polls is itself a poll tax. Rather, Gonzalez argues that, because some voters do not possess the identification required under Proposition 200, those voters will be required to spend money to obtain the requisite documentation, and that this payment is indirectly equivalent to a tax on the right to vote.

**[26]** This analysis is incorrect. Although obtaining identification required under Arizona's statute may have a cost, it is neither a poll tax itself (it is not a fee imposed on voters as a prerequisite for voting), nor is it a burden imposed on voters who refuse to pay a poll tax. *Cf. Harman*, 380 U.S. at 541-42.

Our conclusion is consistent with *Harman*, the only Supreme Court case considering the Twenty-fourth Amendment's ban on poll taxes. In that case, the Court considered

a state statute that required voters to either pay a $1.50 poll tax on an annual basis or go through "a plainly cumbersome procedure," *id.* at 541, for filing an annual certificate of residence. *Id.* at 530-32. There was no dispute that the $1.50 fee was a poll tax barred by the Twenty-Fourth Amendment. *See id.* at 540. Accordingly, the only question before the Court was whether the state "may constitutionally confront the federal voter with a requirement that he either pay the customary poll taxes as required for state elections or file a certificate of residence." *Id.* at 538. The Court enunciated the rule that a state may not impose "a material requirement solely upon those who refuse to surrender their constitutional right to vote in federal elections without paying a poll tax." *Id.* at 542. Applying this rule, the Court determined that the state's certificate of residence requirement was a material burden: among other things, the procedure for filing the certificate was unclear, the requirement that the certificate be filed six months before the election "perpetuat[ed] one of the disenfranchising characteristics of the poll tax which the Twenty-fourth Amendment was designed to eliminate," and the state had other alternatives to establish that voters were residents, including "registration, use of criminal sanction[s], purging of registration lists, [and] challenges and oaths." *Id.* at 541-43. Accordingly, the Court concluded that "[w]e are thus constrained to hold that the requirement imposed upon the voter who refuses to pay the poll tax constitutes an abridgment of his right to vote by reason of failure to pay the poll tax." *Id.* at 542.

**[27]** Arizona's polling place requirement is not analogous. Proposition 200's requirement that voters identify themselves at the polling place is not a poll tax, as stated in *Gonzalez I*. 485 F.3d at 1049. Voters have only to verify their eligibility by showing identification at the polls,[23] which does not consti-

---

[23]Voters who use an early ballot to vote do not even have to show identification. Ariz. Rev. Stat. § 16-550(A) (for early ballots, elector identity is verified by signature comparison alone).

tute a tax, a point which Gonzalez does not dispute. Nor does Proposition 200's identification requirement place a material burden on voters "solely because of his refusal to waive the constitutional immunity" to a poll tax. *Harman*, 380 U.S. at 542. Voters are not given the choice between paying a poll tax or obtaining identification; all voters are required to present identification at the polling place. *See Gonzalez I*, 485 F.3d at 1049. *Cf. Harman*, 380 U.S. at 541-42. Because "Arizona's system does not, as a matter of law, qualify as a poll tax," the district court was correct in concluding that Proposition 200's requirement of identification at the polling place did not violate the Twenty-fourth Amendment. *See Gonzalez I*, 485 F.3d at 1049.

B

**[28]** Nor is Proposition 200's requirement that voters show identification at the polling place a poll tax under the Fourteenth Amendment's Equal Protection Clause.[24] *Harper* is the leading Supreme Court case considering whether a state law is a poll tax under the Equal Protection Clause. In *Harper*, the Supreme Court held that a state law levying an annual $1.50 poll tax on individuals exercising their right to vote in the state was unconstitutional under the Equal Protection Clause. *Id.* at 665-66 & n.1. The Court held that "the interest of the State, when it comes to voting, is limited to the power to fix qualifications," *id.* at 668, and that the imposition of poll taxes fell outside this power because "[w]ealth, like race, creed, or color, is not germane to one's ability to participate

---

[24]ITCA's briefing collapses the Twenty-fourth Amendment and Fourteenth Amendment poll tax claims into a single argument. But these are different claims that arise under different constitutional amendments. The Twenty-fourth Amendment extends only to federal elections, *see Harman*, 380 U.S. at 540 (holding that "the Twenty-fourth Amendment abolish[ed] the poll tax as a requirement for voting in federal elections"), while the Fourteenth Amendment also invalidates restrictions on the right to vote in state elections, *see Harper*, 383 U.S. at 666. Therefore, we have addressed these claims separately.

intelligently in the electoral process," *id.* Because the state's poll tax made affluence of the voter an electoral standard, and such a standard is irrelevant to permissible voter qualifications, the Court concluded that the tax was invidiously discriminatory and a per se violation of the Equal Protection Clause. *Id.* at 666-67.

**[29]** Arizona's polling place identification requirement falls outside of *Harper*'s rule that "restrictions on the right to vote are invidious if they are unrelated to voter qualifications." *Crawford v. Marion Cnty. Elections Bd.*, 128 S. Ct. 1610, 1616 (2008) (plurality opinion). The requirement that individuals show documents proving their identity is not an invidious classification based on impermissible standards of wealth or affluence, even if some individuals have to pay for them. On the contrary, requiring individuals to show identification falls squarely within the state's power to fix core voter qualifications. Photo identification addresses the most basic voter criterion: that individuals seeking to cast a ballot are who they purport to be and are in fact eligible to vote. Even ITCA admits that this is a valid state interest.

ITCA argues that the Court's more recent decision in *Crawford*, 128 S.Ct. 1610,[25] extended *Harper*'s holding to include a prohibition on indirect fees, such as fees or costs necessary to obtain required identification documents. ITCA seeks the benefit of *Harper*'s per se rule that such an electoral standard is invidiously discriminatory, and thus violates the Equal Protection Clause.

---

[25]*Crawford* was decided by the Supreme Court after this court's holding in *Gonzalez I*. ITCA frames *Crawford* as an "intervening controlling authority" that provides a basis for this court to reconsider its decision in *Gonzalez I* that Arizona's registration requirement is not a poll tax. Because *Gonzalez I* did not address whether the polling place identification requirement constituted a poll tax, see 485 F.3d at 1048-49, we need not address this argument.

This argument is not consistent with *Crawford*. *Crawford* involved an Indiana state requirement that a citizen voting in person or at the office of the circuit court clerk before election day present a photo identification card issued by the government. *Id.* at 1613. The state would provide a free photo identification to "qualified voters able to establish their residence and identity." *Id.* at 1614. A number of plaintiffs challenged this requirement on the ground that the "new law substantially burdens the right to vote in violation of the Fourteenth Amendment." *Id.*

Although the Court was unable to agree on the rationale for upholding Indiana's photo identification requirement,[26] neither the lead opinion nor the concurrence held that *Harper*'s per se rule applied to Indiana's photo identification requirement. *See id.* at 1624. The lead opinion, upon which ITCA relies, explained that *Harper*'s "litmus test" made "even rational restrictions on the right to vote . . . invidious if they are unrelated to voter qualifications." *Id.* at 1616. But according to the lead opinion, later election cases had moved away from *Harper* to apply a balancing test to state-imposed burdens on the voting process. *Id.* Under these later cases, a court "must identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule, and then make the 'hard judgment' that our adversary system demands." *Id.* The lead opinion then proceeded to apply this balancing test to the Indiana photo identification requirement. *Id. Crawford* did not purport to overrule *Harper*, however, which remains as an example of an electoral standard for which a state would never have sufficiently weighty interests to justify the requirement that a fee be paid in order to vote. *Id.* Because *Crawford* did not extend *Harper*'s per se rule to other burdens imposed on voters, but left it applicable only to poll tax requirements, *Crawford* does not support ITCA's

---

[26]The lead opinion authored by Justice Stevens was joined by Chief Justice Roberts and Justice Kennedy. Justice Scalia filed a concurring opinion joined by Justice Thomas and Alito. The other three justices dissented.

argument that Proposition 200's identification requirement is per se invalid under *Harper*.

Although ITCA's reliance on *Crawford* is not entirely clear, ITCA does not appear to argue that Proposition 200's identification requirement is invalid under *Crawford*'s balancing test. ITCA does not, for example, claim that the burden imposed by the photo identification was impermissibly heavy in light of Arizona's legitimate interests. Such an argument would be unavailing in any event. The lead opinion in *Crawford* held that the burden imposed on citizens who must obtain a photo identification document was not sufficiently heavy to support a facial attack on the constitutionality of the state law, in light of the state's legitimate interests in deterring and detecting voter fraud, modernizing election procedures, and safeguarding voter confidence. *Id.* at 1617, 1623. The same reasoning is applicable here. While the lead opinion noted that photo identification cards were provided free by Indiana, the lead opinion also recognized that to obtain Indiana's free photo identification cards, individuals were required to "present at least one 'primary' document, which can be a birth certificate, certificate of naturalization, U.S. veterans photo identification, U.S. military photo identification, or a U.S. passport." *Id.* at 1621 n.17. Obtaining these primary documents, the Supreme Court acknowledged, may require payment of a fee. *Id.* Because Proposition 200 identification requirements include these same sorts of primary documents, Proposition 200's requirements are no more burdensome than those upheld by *Crawford*. ITCA does not argue that Arizona's interests in imposing a photo identification requirement are any less weighty than Indiana's interests in deterring and detecting voter fraud, modernizing election procedures, and safeguarding voter confidence. Therefore, even under the balancing test set forth in the *Crawford* lead opinion, we would uphold Proposition 200's polling place identification requirement against a facial challenge.

**[30]** In sum, because any payment associated with obtaining the documents required under Proposition 200's photo

identification provision is related to the state's legitimate interest in assessing the eligibility and qualifications of voters, the photo identification requirement is not an invidious restriction under *Harper*, and the burden is minimal under *Crawford*. As such, Arizona's polling place photo identification requirement does not violate the Fourteenth Amendment's Equal Protection Clause.

V

**[31]** Our system of dual sovereignty, which gives the state and federal governments the authority to operate within their separate spheres, "is one of the Constitution's structural protections of liberty." *Printz v. United States*, 521 U.S. 898, 921 (1997). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Id.* (quoting *Gregory*, 501 U.S. at 458). Despite our respect for the state's exercise of its sovereign authority, however, the Constitution's text requires us to enforce the specific enumerated powers that are bestowed on the federal government and denied to the states. The authority granted to Congress under the Elections Clause to "make or alter" state law regulating procedures for federal elections is one such power. The Framers of the Constitution were clear that the states' authority to regulate extends only so far as Congress declines to intervene. U.S. Const. art. 1, § 4, cl. 1; *e.g.*, *Foster*, 522 U.S. at 69. Given the paramount authority delegated to Congress by the Elections Clause, we conclude that the NVRA, which implemented a comprehensive national system for registering federal voters, supersedes Arizona's conflicting voter registration requirement for federal elections. We uphold Arizona's polling place identification requirement with respect to all other claims.[27]

[27]Each party will bear its own costs on appeal.

**AFFIRMED in part and REVERSED in part.**

---

Chief Judge KOZINSKI, dissenting in large part:*

As the majority belatedly acknowledges 47 pages into its opinion, we don't come to this case with a blank slate. A prior panel has already held in a published opinion that Proposition 200 isn't preempted because the National Voter Registration Act ("NVRA") "plainly allow[s] states, at least to some extent, to require their citizens to present evidence of citizenship when registering to vote." *Gonzalez* v. *Arizona*, 485 F.3d 1041, 1050-51 (9th Cir. 2007) ("*Gonzalez I*"). That is law of the circuit and therefore binding on us. *See, e.g.*, *Miller* v. *Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc). Even if it weren't, it's law of the case and can't be lightly disregarded for that reason. *See, e.g.*, *Merritt* v. *Mackey*, 932 F.2d 1317, 1322 (9th Cir. 1991). The majority refuses to accept the consequences of this reality. First, it evades law of the circuit by creating an exception that is squarely foreclosed by a recent unanimous en banc opinion. The majority then weakens our rules governing law of the case by declaring that *Gonzalez I*'s interpretation of the NVRA is "clearly erroneous" when it's clearly not. Because I believe that we must take precedent seriously and that *Gonzalez I* was correctly decided, I dissent from the majority's conclusion that the NVRA preempts Arizona's voter registration requirement.

## I.

The fundamental rule of circuit law is that once a panel

---

*I concur in the portion of the judgment upholding Proposition 200's polling place provision, Ariz. Rev. Stat. § 16-579. For the reasons articulated by the district court in its thorough decision, I would affirm its ruling in favor of Arizona on the equal protection and Voting Rights Act challenges to Proposition 200's voter registration requirement.

decides a legal issue in a published opinion, that ruling binds subsequent three-judge panels. The only instance when a three-judge panel may depart from a prior published opinion is if there has been "intervening" higher authority that is "clearly irreconcilable with our prior circuit authority." *Miller*, 335 F.3d at 900. And this instance is not truly an exception to the rule because it's the intervening higher authority, not the three-judge panel, that overrules the earlier opinion. There are in fact *no* exceptions to law of the circuit, or at least there weren't until today.

The majority holds that, although a published opinion is binding generally, it doesn't bind later panels in the same case. For those panels, "[w]here no subsequent opinion has relied on the prior published opinion for the proposition to be overturned, . . . the law of the circuit doctrine does not prohibit revising the prior opinion." Maj. at 17668.

This exception to the published opinion rule is irreconcilable with our recent en banc opinion in *United States* v. *Washington*, 593 F.3d 790 (9th Cir. 2010) (en banc) ("*Washington IV*"). In that case, the three-judge panel was confronted with a conflict between a prior opinion in the same case and another panel's opinion in a different case. Because it lacked the power to resolve the conflict, the three-judge panel had to call the case en banc sua sponte. Sitting en banc, we held:

> This appeal was initially argued to a three-judge panel, but the conflict in our precedent led us to rehear the matter en banc without awaiting a three-judge decision. *See Atonio* v. *Wards Cove Packing Co.*, 810 F.2d 1477, 1478-79 (9th Cir. 1987) (en banc). This step was necessary because, even if the panel could have revisited *Washington III* under one of the exceptions to law of the case, *see Jeffries* v. *Wood*, 114 F.3d 1484, 1489 (9th Cir. 1997) (en banc), it still would have been bound by that pub-

lished opinion as the law of the circuit, *see, e.g.*, *Old Person* v. *Brown*, 312 F.3d 1036, 1039 (9th Cir. 2002) ("[W]e have no discretion to depart from pre-cedential aspects of our prior decision in *Old Person I*, under the general law-of-the-circuit rule.").

*Washington IV*, 593 F.3d at 798 n.9.

Applying the *Washington IV* rule to this case is simple. *"[E]ven if"* our three-judge panel were permitted to revisit the prior panel's opinion "under one of the exceptions to law of the case," we are "*still* . . . bound by that published opinion *as the law of the circuit*" and have "*no discretion* to depart from [it]." *Id.* (emphasis added). *Washington IV*—which clearly holds that law of the circuit trumps law of the case—forecloses the majority's theory.

The majority brushes aside *Washington IV*, relying instead on three earlier cases, foremost *Jeffries* v. *Wood*, 114 F.3d 1484 (9th Cir. 1997) (en banc) ("*Jeffries V*"). There are two problems with the majority's reliance on *Jeffries V*, both of which are fatal to the majority's new rule. First, *Jeffries V* was about law of the case, not law of the circuit. *Jeffries V* held that the three-judge panel in *Jeffries IV* erred by failing to fol-low *Jeffries III*, and based this conclusion on law of the case. 114 F.3d at 1492-93. The majority makes much of the fact that the dissent in *Jeffries V* would have resolved the case on law of the circuit grounds. Maj. at 17668. But it is peculiar indeed to impute a *holding* to the majority on an issue it never addressed, because it chose not to follow the contrary reason-ing of the dissent. A dissent has no precedential value, *United States* v. *Ameline*, 409 F.3d 1073, 1083 n.5 (9th Cir. 2005) (en banc), and the majority is surely not obligated to address every argument made there. It is obviously dangerous to infer that the majority ruled on a matter as to which it never expressed an opinion. By that peculiar reasoning, a majority can be held to have decided an issue—and made it law of the circuit—when it never said a word on the subject.

The *Jeffries V* majority had very little to say about law of the circuit, and what it did say totally undermines the majority here: "The dissent seems to acknowledge that [the] law of the circuit doctrine would preclude the *Jeffries IV* panel from contradicting the *Jeffries III* opinion, thus reaching the same result as the majority." *Id.* at 1493 n.12. The majority somehow manages to squeeze blood from a turnip.

Second, to the extent *Washington IV* says something different from *Jeffries V*, it is the most recent en banc opinion and therefore clearly controls. *See United States* v. *Heredia*, 483 F.3d 913, 918-19 (9th Cir. 2007) (en banc) (recognizing that a later en banc court may overrule an earlier en banc opinion). The majority objects that *Washington IV* couldn't have overruled the "longstanding doctrine" that a three-judge panel may overturn a prior panel's published opinion under an exception to the law of the case, maj. at 17669, but the doctrine in fact never existed until today. It has no support in *Jeffries V* or any other published opinion in our circuit.

Take the other two cases the majority cites. *See* maj. at 17666 (citing *Mendenhall* v. *NTSB*, 213 F.3d 464, 469 (9th Cir. 2000) ("*Mendenhall II*"); *Tahoe-Sierra Pres. Council, Inc.* v. *Tahoe Reg'l Planning Agency*, 216 F.3d 764, 786-87 (9th Cir. 2000) ("*Tahoe IV*")). The majority claims these cases support its new rule because both reversed "a prior published appellate opinion as clearly erroneous under the exceptions to the law of the case" doctrine. Maj. at 17666. But neither case contradicted the prior panel's legal ruling and therefore never disturbed the law of the circuit. *See United States* v. *Johnson*, 256 F.3d 895, 916 (9th Cir. 2001) (en banc) (Kozinski, J., concurring) (a legal statement isn't law of the circuit unless "it is clear that a majority of the panel has focused on the legal issue presented by the case before it and made a deliberate decision to resolve the issue").[1]

---

[1]While the majority ignores *Johnson* when exaggerating the precedential effect of two cases that didn't alter the law of the circuit, it relies on

The later *Mendenhall* panel reversed an award of market-rate attorney's fees, *Mendenhall II*, 213 F.3d at 469 & n.3, but didn't overturn the prior panel's statement that "a request [ for] attorneys' fees at a reasonable market rate . . . . is appropriate where there is a showing of bad faith," *Mendenhall* v. *NTSB*, 92 F.3d 871, 876 (9th Cir. 1996). Rather, it realized that the prior panel had mistakenly applied a statute awarding attorney's fees to litigants who prevailed in court to someone who had prevailed in an administrative proceeding. *Mendenhall II*, 213 F.3d at 469. Because the later panel applied the correct statute, it had no occasion to disturb the prior panel's construction of the other statute.

In *Tahoe*, both the earlier panel and the later panel applied the rule that, in general, defendants must affirmatively plead the statute of limitations in a filing with the court. *See Levald, Inc.* v. *City of Palm Desert*, 998 F.2d 680, 686-87 (9th Cir. 1993). The prior panel had held that the plaintiffs' claims weren't time-barred because, by "[f]ailing to plead affirmatively" any statute of limitations other than an irrelevant one, the defendants couldn't then "rely on any other." *Tahoe-Sierra Pres. Council, Inc.* v. *Tahoe Reg'l Planning Agency*,

the *Johnson* concurrence in an attempt to characterize *Washington IV*'s rule as the sort of "casual[ ]" statement "uttered in passing" that isn't binding on later panels. Maj. at 17669-70. But the statement in *Washington IV* was necessary to explain why the three-judge panel had to make a sua sponte en banc call. 593 F.3d at 798 n.9. In any event, statements in en banc opinions, as in Supreme Court opinions, must be taken far more seriously than statements in three-judge panel opinions, even if they are not strictly necessary to the result. *See United States* v. *Baird*, 85 F.3d 450, 453 (9th Cir. 1996) ("[W]e treat Supreme Court dicta with due deference . . . ."). That's because, like *Washington IV*'s rule, a statement in an en banc opinion that's not necessary to resolve the merits of the case often "provides a supervisory function" to "three-judge panels and district courts . . . . [and] thus constitutes authoritative circuit law." *Barapind* v. *Enomoto*, 400 F.3d 744, 751 n.8 (9th Cir. 2005) (en banc); *see, e.g.*, *Miller*, 335 F.3d at 900; *United States* v. *Hardesty*, 977 F.2d 1347, 1348 (9th Cir. 1992) (en banc) (per curiam); *Atonio* v. *Wards Cove Packing Co.*, 810 F.2d 1477, 1478-79 (9th Cir. 1987) (en banc).

34 F.3d 753, 756 (9th Cir. 1994) ("*Tahoe III*"). On remand, the defendants filed an answer that pled the correct statute of limitations, and the later panel held that the claims were therefore time-barred. *Tahoe IV*, 216 F.3d at 788-89. Like *Mendenhall*, the later panel's putative reversal of a prior panel didn't alter a binding statement of circuit law.[2]

Nor are *Mendenhall* and *Tahoe* the only cases on point. A number of panel opinions hold that law of the circuit applies to later panels in the same case. *Old Person* v. *Brown*, 312 F.3d 1036, 1039 (9th Cir. 2002), which *Washington IV* quotes, is a good example. The *Old Person* panel explained that it was bound by a prior opinion because "none of the three exceptions" to law of the case applied, but it was careful to point out that it also had "no discretion to depart from precedential aspects of our prior decision in *Old Person I*, under the general law of the circuit rule." *Id.*; *see also Minidoka Irrigation Dist.* v. *Dep't of Interior*, 406 F.3d 567, 574 (9th Cir. 2005) ("[W]e are 'bound by the opinion of the prior panel as the law of the case. Also we have no discretion to depart from precedential aspects of our prior decision in [*Minidoka I*], under the general law-of-the circuit rule.' " (second alteration in original)); *accord Hilao* v. *Estate of Marcos*, 103 F.3d 767, 772 (9th Cir. 1996) ("This court has twice rejected these arguments in *Estate I* and *Estate II*. The published decisions in those cases are both the controlling law of the circuit and the law of this case." (citations omitted)).

Like *Washington IV*, these opinions explain that three-judge panels are bound by prior panel opinions as law of the

---

[2]*Tahoe IV* said that it overturned *Tahoe III*'s "bare legal holding . . . that the defendants forfeited the correct statute of limitations defense." *Tahoe IV*, 216 F.3d at 788. If that were truly *Tahoe III*'s holding, then the subsequent panel would have overturned law of the circuit. But it wasn't. *Tahoe III* said only that the defendants couldn't rely on a statute of limitations they hadn't pled. Because the defendants hadn't filed their answer, *Tahoe III* couldn't have considered whether they waived their statute of limitations defense.

circuit even if they're not bound by those decisions as law of the case. They also reconcile *Mendenhall II* and *Tahoe IV* with our law of the circuit rule, for neither of those cases departed from "precedential aspects" of the prior panel opinions. But even if *Mendenhall* and *Tahoe* stood for what the majority claims, our three-judge panel doesn't have the power to elevate them above *Old Person*, *Minidoka* or *Hilao*. If "faced with such a conflict," we "*must* call for en banc review, which the court will normally grant unless the prior decisions can be distinguished." *Atonio*, 810 F.2d at 1479 (emphasis added).[3]

---

[3]We're not alone. Most of our sister circuits agree that three-judge panels must follow prior published opinions in the same case as law of the circuit. *See, e.g.*, *Schiavo ex rel. Schindler* v. *Schiavo*, 403 F.3d 1289, 1292 (11th Cir. 2005) ("Because our previous decision was published, the prior panel precedent rule also applies to any holdings reached in the earlier appeal."); *Swipies* v. *Kofka*, 419 F.3d 709, 714 (8th Cir. 2005) ("[W]e held in an earlier appeal in this case that Mr. Swipies possessed such an interest. We are bound to follow this holding. It is not only the law of the case, but the law of the circuit, *i.e.*, a decision of another panel which only the court *en banc* may overturn." (citations omitted)); *Af-Cap Inc.* v. *Republic of Congo*, 383 F.3d 361, 367 n.6 (5th Cir. 2004) ("The subsequent panel would not only have to forego application of the law of the case doctrine, but would also have to discard the well-established rule that circuit panels are 'bound by the precedent of previous panels absent an intervening . . . case explicitly or implicitly overruling that prior precedent.' " (alteration in original)); *United States* v. *Alaw*, 327 F.3d 1217, 1220 (D.C. Cir. 2003) ("[T]hose issues are barred by law of the case doctrine . . . . In addition, the law of the circuit doctrine applicable here prevents a new appellate panel from declining to follow the legal rulings of the panel in a prior appeal."); *Craft* v. *United States*, 233 F.3d 358, 369 (6th Cir. 2000) ("Our decisions in *Craft I* and in *Cole* are also law of the circuit. As we recently stated, 'One panel of this court may not overturn the decision of another panel of this court—that may only be accomplished through an en banc consideration of the argument.' "), *overruled on other grounds by United States* v. *Craft*, 535 U.S. 274 (2002); *Irving* v. *United States*, 162 F.3d 154, 160 (1st Cir. 1998) (en banc) ("In *Irving I*, a panel of this court expressly defined the contours of the discretionary function exception. From then on, that methodology represented both the law of the case and the law of this circuit regarding the due application of the discretionary function exception. . . . Indeed, when the United States asserted the discretionary function defense in *Irving II*, the panel . . . took refuge in the law

Ultimately, this is all academic. There's just no getting around *Washington IV*'s holding that "even if" we were permitted to revisit the prior panel's opinion "under one of the exceptions to law of the case," we are "still . . . bound by that published opinion as the law of the circuit" and have "no discretion to depart from [it]." 593 F.3d at 798 n.9. We can debate the meaning of *Jeffries* all we want, but a unanimous en banc court in *Washington IV* just resolved this very issue against the majority's position. The majority here audaciously contradicts this en banc opinion.[4]

## II.

Even if the majority were right that law of the circuit doesn't apply, *Gonzalez I* undisputedly binds us as law of the case. The majority tries in vain to wriggle out from under *Gonzalez I*'s conclusion that the NVRA doesn't preempt Proposition 200 by invoking the "clearly erroneous" exception to the law of the case. Maj. at 17665-66. But the clearly erroneous bar is a tall one to hurdle: If "it is plausible to find that" the NVRA doesn't preempt Proposition 200, "the hold-

---

of the circuit doctrine to dispense the argument . . . ." (citation omitted)); *Pearson* v. *Edgar*, 153 F.3d 397, 402 (7th Cir. 1998) ("Absent any intervening Supreme Court decisions, *Curtis* and *South-Suburban* would be binding precedent on this issue, and *Curtis* would also be the law of the case."). Such a lopsided verdict from our peers provides yet another reason to question the wisdom of departing from our circuit's well-settled published opinion rule.

[4]To the extent the majority suggests a three-judge panel can overrule published opinions because they're "clearly erroneous," it also conflicts with *United States* v. *Contreras*, 593 F.3d 1135 (9th Cir. 2010) (en banc). *Contreras* reversed the portion of a panel opinion that had purported to overrule several clearly erroneous published opinions because the panel lacked authority to do so—even though the en banc court then adopted the panel's legal analysis. *Id.* at 1136; *cf. State Oil Co.* v. *Khan*, 522 U.S. 3, 20 (1997) (court of appeals was correct not to overrule an "infirm[ ]" Supreme Court decision that it rightly predicted would be overturned by the Supreme Court).

ing in [*Gonzales I*] cannot be deemed clearly erroneous." *Leslie Salt Co.* v. *United States*, 55 F.3d 1388, 1394 (9th Cir. 1995). "[I]t is incumbent upon [plaintiffs] to convince us not only that the majority decision in [*Gonzales I*] was wrong, but that it was clearly wrong." *Merritt*, 932 F.2d at 1322; *see also Jeffries V*, 114 F.3d at 1489. The majority fails to carry this heavy burden and materially weakens the standard for all future cases by pretending that it does.

## A.

According to the majority, the *Gonzalez I* panel's "conclusion was rooted in a *fundamental misreading* of the statute." Maj. at 17664 (emphasis added). "*Reasoning* from a fundamental misreading of the statute, the prior panel reached a conclusion that was clear error." *Id.* at 17665 (emphasis added). But we don't examine prior panels' *reasoning*. We must follow *Gonzales I* unless the "*decision* . . . is so clearly incorrect that we are justified in refusing to regard it as law of the case." *Merritt*, 932 F.2d at 1321 (emphasis altered); *see Christianson* v. *Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) ("[T]he law of the case turns on whether a court previously 'decide[d] upon a rule of law' . . . not on whether, or how well, it explained the decision." (second alteration in original)).

We might "scrutinize the merits . . . with greater care" if *Gonzalez I* lacked any "analysis reflecting the authorities or argument which led [it] to the rule [it reached]." *United States* v. *Houser*, 804 F.2d 565, 568 (9th Cir. 1986). But the law of the case doctrine doesn't allow us to assume that poor reasoning begets clear error. Indeed, we've held that a panel's failure to "expressly address [a] claim in its opinion"—and corresponding failure to offer any reasons for its resolution of that claim—*isn't* clearly erroneous. *Leslie Salt*, 55 F.3d at 1393.

A panel's faulty reasoning doesn't necessarily consign its conclusion to the trash heap; most conclusions can be arrived at through multiple chains of reasoning. And, although "panels will *occasionally* find it appropriate to offer alternative rationales," *Johnson*, 256 F.3d at 914 (emphasis added), they're not required to do so. Thus, the existence of perceived holes in a prior panel's stated rationale doesn't preclude the possibility that the panel had unstated reasons leading it to the same conclusion. It certainly doesn't mean that the result the panel reached is incorrect, as it may have reached the correct result for the wrong reason.[5] When we say that a panel's holding is clearly wrong, what we're talking about is the rule of law it announces, not the method by which it adopts that rule.[6]

This distinction doesn't matter here because *Gonzalez I* wasn't clearly erroneous in either reasoning or result. Let's start with *Gonzales I*'s statement that "[t]he NVRA mandates that states either 'accept and use the mail voter registration form prescribed by the [Election Assistance Commission,]' or, in the alternative, 'develop and use [their own] form,' as long as the latter conforms to the federal guidelines." *Gonza-*

---

[5]This principle also informs our review of district court judgments. "In the review of judicial proceedings the rule is settled that, if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason." *Thos. P. Gonzalez Corp.* v. *Consejo Nacional de Produccion de Costa Rica*, 614 F.2d 1247, 1256 (9th Cir. 1980).

[6]Focusing on a panel's reasoning defeats the fundamental purpose of law of the case doctrine—protecting the court and the parties from the burden of repeated argument by pertinacious litigants—by encouraging the parties to relitigate their case. *See* 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4478 at 667 (2d ed. 2002). Such relitigation can slow decisionmaking to a glacial pace, which is what happened to administrative agencies when judges began to allow litigants to challenge the reasons the agencies gave for the new regulations they proposed. *See, e.g.*, Thomas O. McGarity, *Some Thoughts on "Deossifying" the Rulemaking Process*, 41 Duke L.J. 1385, 1385-86, 1400-03 (1992); M. Elizabeth Magill, *Agency Choice of Policymaking Form*, 71 U. Chi. L. Rev. 1383, 1390-91 & n.17 (2004).

*lez I*, 485 F.3d at 1050 (third alteration in original) (citations omitted). The majority takes issue with this passage because the NVRA requires states to accept and use *both* the federal and state forms; ergo, *Gonzalez I* misconstrued the statute. Maj. at 17664. But "the word 'or' is often used as a careless substitute for the word 'and'; that is, it is often used in phrases where 'and' would express the thought with greater clarity." *De Sylva* v. *Ballentine*, 351 U.S. 570, 573 (1956). Indeed, it is well recognized that "or" can have multiple meanings, with the "exclusive or"—meaning one or the other but not both— being largely useful in symbolic logic rather than common parlance. Wikipedia, Exclusive or, http://en.wikipedia.org/wiki/Exclusive_or (last visited Aug. 21, 2010).[7]

---

[7]Wikipedia gives the following example to illustrate the difference between the exclusive and the inclusive "or":

> [I]t might be argued that the normal intention of a statement like "You may have coffee, or you may have tea" is to stipulate that exactly one of the conditions can be true. Certainly under many circumstances a sentence like this example should be taken as forbidding the possibility of one's accepting both options. Even so, there is good reason to suppose that this sort of sentence is not disjunctive at all. If all we know about some disjunction is that it is true overall, we cannot be sure that either of its disjuncts is true. For example, if a woman has been told that her friend is either at the snack bar or on the tennis court, she cannot validly infer that he is on the tennis court. But if her waiter tells her that she may have coffee or she may have tea, she can validly infer that she may have tea. Nothing classically thought of as a disjunction has this property. This is so even given that she might reasonably take her waiter as having denied her the possibility of having both coffee and tea.
>
> . . . .
>
> There are also good general reasons to suppose that no word in any natural language could be adequately represented by the binary exclusive "or" of formal logic.

Wikipedia, Exclusive or, http://en.wikipedia.org/wiki/Exclusive_or (last visited Aug. 21, 2010).

Legislatures—which presumably choose statutory language with care—have used "or" conjunctively instead of as a disjunctive, exclusive "or." *See, e.g.*, *Chemehuevi Tribe of Indians* v. *Fed. Power Comm'n*, 420 U.S. 395, 417-18 (1975) ("utilizing the surplus water or water power"); *Swearingen* v. *United States*, 161 U.S. 446, 450 (1896) ("obscene, lewd or lascivious"); *see also* Steven Wisotsky, *How To Interpret Statutes—Or Not: Plain Meaning and Other Phantoms*, 10 J. App. Prac. & Process 321, 326-27 (2009). And phrases that seem obviously disjunctive like "or, in the alternative" are sometimes used conjunctively. *See* H.W. Fowler, *A Dictionary of Modern English Usage* 147 (2d ed. 1965). Thus, the *Gonzalez I* panel could have meant that a state may rely exclusively on the federal form or, in the alternative, also develop a state form.[8] This is a perfectly accurate description of the NVRA.

The majority protests that *Gonzalez I* couldn't have used "or" conjunctively because "such an interpretation would be contrary to the prior panel's logic." Maj. at 17664. But it's only contrary to the *majority's interpretation* of the prior panel's logic—and the majority begins its interpretation by assuming *Gonzalez I* misread the statute. This is known as begging the question. If we begin with the presumption that unanimous three-judge panels don't misread statutes, the "or" can easily be construed conjunctively, to support the conclusion that *Gonzalez I* interpreted the NVRA correctly. *Cf. United States* v. *Brown*, 459 F.3d 509, 525 (5th Cir. 2006) ("[I]f we begin with the assumption that [the defendant] is guilty, the documents can be read to support that assumption. But if we begin with the proper presumption that [he] is not

---

[8]Our own precedent shows that "and" and "or" can sometimes be used interchangeably. For example, in *MacDonald* v. *Pan American World Airways, Inc.*, the majority construed "and" in a contract as "or" despite a particularly eloquent dissent. 859 F.2d 742, 744-45 (9th Cir. 1988); *see id.* at 746 (Kozinski, J., dissenting). *MacDonald* is law of the circuit as to the "and" versus "or" issue and stands in the way of the majority's claim that the *Gonzalez I* panel somehow misread the statute.

guilty . . . , we must conclude the evidence is insufficient
. . . .”).

   The other two quotes to which the majority points support
its argument even less. *Gonzalez I* states that section 1973gg-
7(b) of the NVRA “prohibits states from requiring that [their]
form be notarized or otherwise formally authenticated,” and
“permits states to ‘require[ ] such identifying information . . .
as is necessary to enable . . . election official[s] to assess the
eligibility of the applicant.’ ” 485 F.3d at 1050 (alterations in
original). The majority argues that *Gonzalez I* “misread” the
statute because the “portions of the NVRA that relate to the
Federal Form . . . are directed solely at the [Election Assis-
tance Commission], not the states.” Maj. at 17664. But these
instructions to the Commission *do* apply to the states through
section 1973gg-4(a)(2), which allows states to “develop and
use” their own form if it “meets all of the criteria stated in
section 1973gg-7(b).” *Gonzalez I* reads the statute correctly;
it is the majority here that is mistaken.

## B.

   Even if the majority’s reasoning is wrong, its conclusion
that *Gonzalez I* clearly erred could still be correct if the
NVRA *must* be read to preempt state law. But it’s not enough
for the majority to find a construction of the statute it likes
better. After all, many statutes can plausibly be construed two
different ways, neither of which can be said to be clearly
wrong. *See, e.g.*, *Chevron, U.S.A., Inc.* v. *Natural Res. Def.
Council*, 467 U.S. 837, 843 (1984) (“[I]f the statute is silent
or ambiguous with respect to the specific issue, the question
for the court is whether the agency’s answer is based on a *per-
missible* construction of the statute.” (emphasis added)). To be
clearly erroneous, the prior panel’s construction must be so
flawed that it could not pass the second step of the *Chevron*
test, had that construction been adopted by an administrative
agency. *See id.* at 844 (“[A] court may not substitute its own
construction of a statutory provision for a *reasonable* interpre-

tation made by the administrator of an agency." (emphasis added)).

In this case, the text of the NVRA doesn't "directly address[ ] the precise question at issue," *id.* at 843, namely whether states can ask for supplemental proof of citizenship. The statute says that "[e]ach State shall accept and use the mail voter registration application form prescribed by the [Election Assistance Commission]." 42 U.S.C. § 1973gg-4(a)(1). It likewise requires "[a]cceptance of completed voter registration application forms" at state and local government offices, which must be transmitted "to the appropriate State election official." 42 U.S.C. § 1973gg-5(a)(4)(iii). The statute doesn't obviously prohibit supplemental state requirements, and both preemptive and non-preemptive constructions of "accept" and "use" are plausible. The prior panel's construction thus easily passes the *Chevron* test.

The majority believes that, by requiring states to "accept and use" the federal form "for the registration of voters in elections for Federal office," 42 U.S.C. § 1973gg-4(a)(1), the NVRA precludes states from imposing additional requirements. Maj. at 17654, 17665. But neither "accept" nor "use" has such a preclusive meaning; it's entirely possible to accept and use something for a particular purpose, yet not have it be sufficient to satisfy that purpose. Just go to any liquor store that takes personal checks: They will happily accept and use your check, but only after you provide ID showing that you're authorized to write it. A minute's thought comes up with endless such examples: passport and visa; car registration and proof of insurance; boarding pass and picture ID; eggs and ham. Those who accept and use the former often also require the latter.

The majority's contention that "accept and use" must be read preclusively "[i]n the context of the NVRA," or "under an Elections Clause framework," maj. at 17665, is unconvincing because its understanding of "use" conflicts with that

word's plain English meaning. As the Supreme Court has observed,

> Webster's defines "to use" as "[t]o convert to one's service" or "to employ." Webster's New International Dictionary 2806 (2d ed. 1950). Black's Law Dictionary contains a similar definition: "[t]o make use of; to convert to one's service; to employ; to avail oneself of; to utilize; to carry out a purpose or action by means of." Black's Law Dictionary 1541 (6th ed. 1990). Indeed, over 100 years ago we gave the word "use" the same gloss, indicating that it means " 'to employ' " or " 'to derive service from.' " *Astor* v. *Merritt*, 111 U.S. 202, 213 (1884).

*Smith* v. *United States*, 508 U.S. 223, 228-29 (1993) (alterations in original). To "use" an object is simply to derive service from or utilize it. The NVRA doesn't say that states must treat the federal form as a complete application. It might preclude a state from requiring an applicant to provide yet again the information that is already on the federal form, but that's not the case here. There's no question that Arizona accepts and uses the federal form for the information contained in it. Arizona only asks for proof of citizenship *in addition* to the form in order to complete the registration process.

Nor is the "accept and use" requirement necessarily converted into a broad preemption provision by the NVRA's general statement that "notwithstanding any other Federal or State law, in addition to any other method of voter registration provided for under State law, each State shall establish procedures to register to vote in elections for Federal office." 42 U.S.C. § 1973gg-2(a); *see* maj. at 17654. That provision merely requires states to implement the NVRA regardless of any contrary legal authority. It doesn't alter the substantive scope of the statute.

The *only* thing the NVRA expressly prohibits states from requiring is "notarization or other formal authentication." 42

U.S.C. § 1973gg-7(b)(3). The inclusion of a specific prohibition is a strong indication that other prohibitions weren't intended. *See United States* v. *Cabaccang*, 332 F.3d 622, 630 (9th Cir. 2003); *see also U.S. Term Limits, Inc.* v. *Thornton*, 514 U.S. 779, 793 n.9 (1995).

Moreover, the NVRA expressly authorizes states to require "such identifying information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant." 42 U.S.C. § 1973gg-7(b)(1). This provision can plausibly be read as authorizing the type of "identifying information" that Arizona requires. The majority holds that this passage is part of a comprehensive framework preventing states from requiring proof of citizenship, but overlooks the possibility that such proof may be "necessary to enable" Arizona to assess eligibility. *See* maj. at 17652-53.

Other states also require supplemental information and the current National Voter Registration Form, available at http://www.eac.gov/assets/1/Page/National Mail Voter Registration Form – English.pdf ("Registration Form"), seamlessly accommodates them. The current form includes a box labeled "ID Number" that directs applicants to "[s]ee item 6 in the instructions for your state." Item 6, in turn, catalogs the state-by-state requirements each applicant must satisfy before the state will "accept and use" the federal form. Just like Arizona, many states require applicants to include proof of eligibility. In Alabama, "[y]our social security number is requested." Registration Form at 3. Connecticut requires a "Connecticut Driver's License Number, or if none, the last four digits of your Social Security Number." *Id.* at 5. Hawaii tells applicants that "[y]our full social security number is required. It is used to prevent fraudulent registration and voting. Failure to furnish this information will prevent acceptance of this application." *Id.* at 7. There's more, but you get the idea. The majority's reading of the NVRA casts doubt on the voter registration procedures of many states in addition to Arizona.

The simple truth is that *nothing* in the NVRA clearly supersedes Arizona's supplemental registration requirements. To get its way, the majority invents a broad rule of same-subject-matter preemption, arguing that the NVRA "addresses precisely the same topic as Proposition 200 in greater specificity, namely, the information that will be required to ensure that an applicant is eligible to vote in federal elections," such that its "comprehensive regulation" of the voter registration procedure "clearly subsumes Proposition 200's additional documentary requirement." Maj. at 17652-53. But, as the majority acknowledges earlier in its opinion, the question under the Elections Clause isn't whether the two laws address "the same topic," but whether Arizona's law "complements" rather than conflicts with "the congressional procedural scheme." Maj. at 17643 (citing *Ex parte Siebold*, 100 U.S. 371, 384 (1879)); *see also Foster* v. *Love*, 522 U.S. 67, 74 (1997) (state's election law is preempted "to [the] extent [that] it conflicts with federal law"). There's no conflict based on the text of the statutes. Arizona gladly accepts and uses the federal form, it just asks that voters also provide some proof of citizenship.

Had Congress meant to enact a comprehensive code of voter registration, it could have said so in the NVRA, but it didn't. Congress may have had the more modest goal of balancing ease of registration against each state's interest in protecting its voting system. Had Congress explicitly prohibited states from imposing additional requirements, then we could plausibly conclude that *Gonzalez I* is clearly wrong. But it didn't, and therefore the majority has no authority under the law of the case doctrine to "depart from [the] prior decision." *Jeffries V*, 114 F.3d at 1493.

## C.

The majority offers several of its own reasons for why the NVRA preempts Arizona's law. "If this court were considering the issue for the first time, [these] arguments might well deserve closer consideration." *Leslie Salt*, 55 F.3d at 1395.

But "at this point in the proceedings, [we] may address the merits of [the] claims only so far as necessary to determine whether the [*Gonzalez I*] court was clearly wrong." *Id.* at 1394. None of the majority's reasons meet this exacting standard.

**1.** The majority claims that "allowing states to impose their own requirements for federal voter registration . . . would nullify the NVRA's procedure for soliciting state input, and aggrandize the states' role in direct contravention of the lines of authority prescribed by Section 7." Maj. at 17654. But Congress never granted much authority to the Election Assistance Commission. The Commission can't write many regulations, 42 U.S.C. § 15329, can't enforce the NVRA or the regulations it writes, *id.* § 1973gg-9, and has no investigative powers. That's not the profile of an agency in charge of a comprehensive regulatory scheme. *Cf. CFTC* v. *Schor*, 478 U.S. 833, 842 (1986) (O'Connor, J.) ("Congress empowered the CFTC 'to make and promulgate such rules and regulations as . . . are reasonably necessary *to effectuate any of the provisions or to accomplish any of the purposes of* [the CEA].' " (alteration in original)). And Section 7 of the NVRA doesn't even prescribe lines of authority; it orders the Commission to consult with the states when developing the federal form. *See id.* § 1973gg-7(a). If anything, this indicates that Congress didn't want to aggrandize the Commission's power over the states. It certainly doesn't "demonstrate a legislative intent to limit States to a purely advisory role." *Cal. Coastal Comm'n* v. *Granite Rock Co.*, 480 U.S. 572, 584 (1987) (O'Connor, J.); *see also Block* v. *Cmty. Nutrition Inst.*, 467 U.S. 340, 347 (1984) (O'Connor, J.).

Nor is the majority right to rely on the letter from the Election Assistance Commission telling Arizona that its proof-of-citizenship requirement violates the NVRA. Maj. at 17654. We don't give deference to administrative agencies on the question of preemption. *See Wyeth* v. *Levine*, 129 S. Ct. 1187, 1200-01 (2009) ("In such cases, the Court has performed its

own conflict determination, relying on the substance of state and federal law and not on agency proclamations of preemption."). Even if we did, we wouldn't defer in this case, because an informal letter clearly lacks "the force of law." *United States* v. *Mead Corp.*, 533 U.S. 218, 226-27 (2001). Determining whether the NVRA preempts Arizona's proof-of-citizenship requirement begins and ends with the statute.

For the same reason, the majority's claims that states shouldn't be able to make an "end-run around the [Election Assistance Commission]'s consultative process," maj. at 17655, and that allowing states to supplement the federal form "would make the [Commission's] procedure for consultation . . . an empty exercise," *id.* at 17665, beg the question of whether the Commission can bind the states. Congress may have intended to grant states the power to supplement federal rules despite the Commission's objection. *Cf. Cuomo* v. *Clearing House Ass'n*, 129 S. Ct. 2710, 2717 (2009) (states can enforce state fair-lending laws that OCC tried to preempt). If Congress intended to give states this power to disagree, then Arizona hasn't made an end-run at all.

**2.**   The majority relies on the fact that the NVRA "addresses precisely the same topic as Proposition 200 in greater specificity, namely, the information that will be required to ensure that an applicant is eligible to vote in federal elections." Maj. at 17652. But the NVRA's text never states that it's the exclusive authority on this issue, or that the federal form must be "a fully sufficient means of registering to vote in federal elections." Maj. at 17665. It's perfectly plausible that the NVRA would have set the minimum information states must require, prohibited one specific type of requirement (formal authentication) and established a consultative process for developing a national form. Such broad, flexible guidance is far from a definitive regulatory scheme. Moreover, if the statute permits zero deviation from the federal form, why permit states to develop their own forms at all?

The only development needed would be photocopying the federal form.

Relatedly, the majority claims that because the NVRA prohibits requiring "notarization or other formal authentication," 42 U.S.C. § 1973gg-7(b)(3), Congress must have intended to prohibit states from imposing *any* supplemental requirements. Maj. at 17653. But Congress doesn't disguise general proscriptions of everything as specific proscriptions of one narrow thing. *See Whitman* v. *Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001) ("Congress . . . [doesn't] hide elephants in mouseholes."). Nor would permitting Arizona to require proof of citizenship free it to violate the NVRA's ban on requiring formal notarization. Maj. at 17654. Refusing to enforce an *unwritten* ban hardly weakens the force of an *express* prohibition.

**3.** The majority devotes much time to making the case that "the thrust of the NVRA is to increase federal voter registration by streamlining the registration process." Maj. at 17651; *see id.* at 17644-45. It spends endless pages reviewing the history of voting laws, *id.* at 17644-46, discussing congressional hearings on the general problem of voter participation, *id.* at 17646, and reviewing the many operative parts of the NVRA, maj. at 17646-52. But the majority's lengthy disquisition on history and purpose only highlights the absence of *any* textual support for its conclusion that Congress meant to increase voter registration by prohibiting state-imposed supplemental requirements. To the extent we rely on purpose at all, we should focus on the purposes codified in the statute rather than our guesses based on reading the tea leaves of history and context. *See Exxon Mobil Corp.* v. *Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005).

The NVRA's four purposes are:

(1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

(2) to make it possible for Federal, State, and local
governments to implement this subchapter in a man-
ner that enhances the participation of *eligible* citi-
zens as voters in elections for Federal office;

(3) to protect the integrity of the electoral process;
and

(4) to ensure that accurate and current voter registra-
tion rolls are maintained.

42 U.S.C. § 1973gg(b) (emphasis added). Congress thus told
us that it was concerned with maximizing the registration of
"eligible" voters, in addition "to protect[ing] the integrity of
the electoral process" and "ensur[ing] that accurate and cur-
rent voter registration rolls are maintained." *Id. None* of these
purposes is served when individuals who are not citizens reg-
ister to vote. *See John* v. *United States*, 247 F.3d 1032,
1036-37 (9th Cir. 2001) ("We must not 'interpret federal stat-
utes to negate their own stated purposes.' "). The majority
never explains why a statute enacted to "protect the integrity
of the electoral process" and "ensure" that voter rolls are "ac-
curate" must preclude states from confirming that those who
wish to register are, in fact, eligible to vote.

* * *

The majority distorts two major areas of law before it even
reaches the merits. It creates an unprecedented exception to
our law of the circuit rule, trampling underfoot a newly
minted en banc opinion. The majority also makes a mess of
the law of the case analysis by taking issue with a prior
panel's *reasoning*, not its conclusion. And, as to the merits,
the panel comes nowhere close to proving that *Gonzalez I*'s
interpretation of the National Voter Registration Act was
wrong, much less clearly wrong. Few panels are able to upset
quite so many apple carts all at once. Count me out.